**Margo NEFF, Barbara Spear, and Fred Tallmadge, for themselves and those similarly situated, Plaintiffs,**

v.

**VIA METROPOLITAN TRANSIT AUTHORITY and the City of San Antonio, Defendants.**

**No. CIV.A. SA94CA0691FB.**

United States District Court,
W.D. Texas,
San Antonio Division.

March 25, 1998.

James C. Harrington, Texas Civil Rights Project, Garth A. Corbett, Advocacy Incorporated, Pamela Breed Bonavita, Advocacy Incorporated, Austin, TX, for Margo Neff, Barbara Spear, For Themselves and Those Similarly Situated.

Lawrence Robert Linnartz, Butler & Binion, Warren N. Weir, Weir & Alvarado, P.C., San Antonio, TX, for VIA Metropolitan Transit Authority.

Terry S. Bickerton, Attorney at Law, Regina Bacon Criswell, Denton, McKamie & Navarro, San Antonio, TX, for City of San Antonio.

## ORDER APPROVING CLASS ACTION SETTLEMENT

BIERY, District Judge.

Before the Court is a case involving the Americans with Disabilities Act enacted in 1990 and the Rehabilitation Act of 1973. Exemplifying the idea that peaceable resolution of disputes is not an exact science but is the essence of the art of compromise, a suggested agreement to bring closure to this controversy has been considered by the Court. The parties move jointly for this Court's approval of a proposed settlement agreement seeking a reasonable balance between the transportation needs of the disabled people in San Antonio, Texas, and the expenditure of taxpayer money for basic conveyance requirements of the affected class.

This case was initiated July 26, 1994, with the filing of the class action complaint against defendant VIA Metropolitan Transit Authority in County Court at Law Number 5 in Bexar County, Texas. The case was removed to federal court August 17, 1994, and the City of San Antonio was added as a defendant September 14, 1994. The parties, through their counsel, have engaged in thousands of hours of legal work, investigation, analysis, and mediation. Resulting from this effort was a joint motion by the parties for preliminary class certification, joint motion for preliminary approval of the settlement agreement, and joint motion for approval of the proposed notice to class members informing the settlement class of the settlement and of the hearing wherein the parties would request final approval of the proposed settlement agreement pertaining to a settlement class consisting of:

individuals with disabilities who are covered by the Acts [Americans with Disabilities Act, 42 U.S.C. § 12141 et seq. and the Rehabilitation Act of 1973, § 504] and who are or have been eligible to use transportation services and facilities provided by VIA.

On October 23, 1997, the form of notice was approved by order of this Court, and the Court also preliminarily approved the proposed settlement agreement and conditionally certified the class pursuant to rules 23(a), (b)(2) and (e) of the Federal Rules of Civil Procedure solely for the purpose of settlement. The proposed settlement agreement presented to this Court was reached by the parties and their counsel with the assistance of the mediator, the Honorable Blair Reeves.

TRIBUTE TO THE MEDIATOR—THE HONORABLE BLAIR REEVES, CHIEF JUSTICE (RETIRED) FOURTH COURT OF APPEALS OF TEXAS

In the best traditions of the legal profession, attorneys for plaintiffs and defendants have, as advocates and counselors at law, worked to achieve an appropriate accommodation consistent with the spirit of the disability law envisioned by Senator Robert Dole and other legislators in 1990. Because of his military service, Senator Dole knows full well the day-to-day realities of less than full use of one's physical faculties. The catalyst for the compromise and implementation of legislative intent is the contribution of Retired Chief Justice Reeves, chosen by the Court to facilitate the alternate dispute resolution process because of his unique position to comprehend both sides of the issue: For over half a century, he has been confined to a wheelchair and for many of those fifty years has been entrusted by the sovereign citizens of this region with the responsibility of helping to manage the public treasury.

Selflessly giving up the possibility of a college football career, eighteen-year-old "Bruzzy" Reeves volunteered to protect the people of the United States as a Marine infantryman in the epic battles of Bougainville, Emirau, Guam, and Okinawa. Transcending the wounds of war, he held public office for over thirty years, and risked his political life to help create the South Texas Medical Center which now employs 40,000

workers and generates a $1.6 billion economic impact. Most recently, he has again answered the call of public trust to assist in bringing about the amicable closure of this controversy, which result may serve as a model for other transit authorities seeking pragmatic methods to address the needs of their most vulnerable patrons.

In the ever continuing human effort to move from darkness to light, Blair Reeves' journey and his nobility of spirit—created not by birthright but by the courage of his conduct and forged on the anvil of adversity—are examples to us all. A rabbi long ago taught: "Blessed are the peacemakers ..." Indeed, whether as youthful warrior or wise peacemaker, this grateful community is once again blessed to have its good and faithful servant, the Honorable Blair Reeves.

## JOINT MOTION FOR APPROVAL OF SETTLEMENT AND FAIRNESS HEARING

All parties, counsel, and Justice Reeves have represented to the Court their unanimous opinion the proposed settlement agreement is fair, adequate, and reasonable. The joint motion for final approval of the settlement was briefed, and the proposed agreement was the subject of an extensive hearing, Fairness Hearing, held January 23, 1998. At the hearing, the request for approval was supported by affidavits, testimony from members of the class and transit authority management, and documents admitted into the record. The parties believe final approval of this case as a class action is a viable alternative for ending on-going litigation that would be costly and, in all likelihood, take years to resolve. Full compliance with the settlement agreement provides the means for significantly improving the quality of transportation services VIA provides to persons with disabilities as well as the related transportation services the City of San Antonio is responsible for providing to the plaintiffs and the class members. Recognizing that no settlement will please all the people all the time, and based on the submissions and the Court's Findings of Fact and Conclusions of Law Regarding Fairness of Class Action Settlement rendered below, the Settlement is APPROVED.

## I. CERTIFICATION OF CLASS/JURISDICTION

### A. JURISDICTION

Plaintiffs' complaint alleges violations of the standards of Title II of the Americans with Disabilities Act and section 504 of the Rehabilitation Act of 1973, and their implementing regulations. The Court has jurisdiction over this case and over the class. 28 U.S.C. § 1331.

### B. CLASS CERTIFICATION

As indicated in the original petition filed in state court and in plaintiffs' first amended complaint filed with this Court, the plaintiffs sought to bring this action on behalf of themselves and as a class action on behalf of those similarly situated alleging the defendants systematically, as a matter of policy and practice, refused to investigate and failed to provide necessary, and statutorily guaranteed, accessible public transportation for individuals with disabilities in the most integrated setting and that such failure discriminated against individuals in violation of the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973. In federal court, class actions are governed by rule 23 of the Federal Rules of Civil Procedure. The four threshold requirements of rule 23(a) are:

> (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interest of the class").

*Amchem Prods., Inc. v. Windsor,* —— U.S. ——, ——, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997). In addition to satisfying the above requirements, the "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id.* Here, the parties are seeking certification pursuant to rule 23(b)(2) which "per-

mits class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.'" *Id.* A prime example of a rule 23(b)(2) class is a civil rights case "against parties charged with unlawful, class-based discrimination." *Id.*

Plaintiffs moved for class certification in September of 1994. Although the City of San Antonio had been added as a defendant at that time, it had not yet appeared. Therefore, defendant VIA filed its opposition to plaintiffs' motion asking the Court either to not certify the class or to postpone its ruling until the City of San Antonio had an opportunity to respond and until both defendants could conduct discovery concerning the class issue. Without ruling on the pending motion, the Court referred the case to mediation by formal order entered October 31, 1994. The mediation resulted in the parties reaching the proposed settlement; defendants agreed to class certification for settlement purposes only. Despite the conditional class certification of October 23, 1997, however, one circuit has held that "courts employing settlement classes must still make findings that the class complies with Rule 23(a) and the appropriate parts of Rule 23(b)" and the failure to do so is "a plain error of law, and hence an abuse of discretion, requiring the certification be set aside." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 800 (3rd Cir.), *cert. denied*, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995). The Supreme Court has reviewed this issue and modified the Third Circuit's interpretation that each requirement under rule 23(a), and in that case 23(b)(3), "must be satisfied without taking into account the settlement," to "settlement is relevant to a class certification." *Amchem Prods.*, —— U.S. at ——, 117 S.Ct. at 2248. In light of the *Amchem Prods.* decision, the Supreme Court vacated the judgment and remanded for reconsideration a class action settlement affirmed by the Fifth Circuit Court of Appeals. *Flanagan v. Ahearn*, —— U.S. ——, 117 S.Ct. 2503, 138 L.Ed.2d 1008 (1997). After oral argument and reconsideration, the Fifth Circuit found nothing in the *Amchem* opinion changed the prior decision. The court affirmed its prior decision. *In re*

*Asbestos Litig.*, 134 F.3d 668, 669 (5th Cir. 1998). In its prior opinion, the Fifth Circuit provided this insight concerning whether a court should consider settlement in determining if the prerequisites of rule 23 are satisfied:

> The rule that a court should consider a proposed settlement, if one is before it, when deciding certification issues makes good sense. Settlements and the events leading up to them add a great deal of information to the court's inquiry and will often expose diverging interests or common issues that were not evident or clear from the complaint. (Citation omitted.)

> We are bound to follow *Container I's* [*In re Corrugated Container Antitrust Litigation*, 643 F.2d 195 (5th Cir.), *aff'd*, 659 F.2d 1322 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294, and *cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982)] holding that the district court can and should look at the terms of a settlement in front of it as part of its certification inquiry. We would adopt this rule even if we were not bound by precedent because it enhances the ability of district courts to make informed certification decisions.

*In re Asbestos Litigation*, 90 F.3d 963, 975 (5th Cir.1996), *cert. granted, judgment vacated by* —— U.S. ——, 117 S.Ct. 2503, 138 L.Ed.2d 1008 (1997), *aff'd*, 134 F.3d 668 (5th Cir.1998). Keeping in mind these guidelines, this Court will examine the class action prerequisites.

### 1. *Rule 23(a) Prerequisites*

In deciding whether to certify a class, a district court is given wide discretion. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471–72 (5th Cir.1986). "A class may be certified if all four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met and one or more of the provisions of Rule 23(b) is satisfied." *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 523 (E.D.Tex.1995). Rule 23(a) provides as follows:

> One or more members of a class action may sue or be sued as representative parties on behalf of all only if (1) the class is

so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

### a. *Numerosity*

■ As set forth in rule 23(a)(1), the numerosity prerequisite is met when "joinder of all parties is impracticable." To meet this requirement, the exact number of potential members need not be established nor do the members of the class need to be identified individually. *Celestine v. Citgo Petroleum Corp.*, 165 F.R.D. 463, 466 (W.D.La.1995). Other factors in addition to the actual or estimated number of potential class members relevant to the numerosity element include, for example, "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir.1981). The proper focus is not solely on the number of members but "on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Id.* (quoting *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1022 (5th Cir.1981)). Moreover, in certifying a class seeking only injunctive relief, as is the case here, the numerosity requirement may be fulfilled even when the class is small because the benefits to be gained not only inure to the benefit of the known class but also will benefit a future class of indeterminate size. *Young v. Pierce*, 544 F.Supp. 1010, 1028 (E.D.Tex.1982). These unknown future members should be properly considered and included as a part of the class, and "joinder of such persons is inherently impracticable." *Id.* at 1028–29.

■ The parties ask this Court to certify a class seeking injunctive and declaratory relief on behalf of all individuals with disabilities who are eligible now or may be eligible in the future for transportation by the defendants. The parties are aware of at least 12,000 individuals who are certified to use the services provided by defendants. However, not every disabled person living in the geographical area served by defendants necessarily uses the services provided but will benefit from the settlement should they seek to use them in the future. Accordingly, this Court concludes the joinder of all parties is indeed impracticable and therefore, the numerosity requirement has been met.

### b. *Commonality*

■ The commonality requirement of rule 23(a) requires there be at least one factual or legal issue which is common to all or substantially all of the class members. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.1986). Thus, "[t]he commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993). "The threshold of 'commonality' is not high." *Jenkins*, 782 F.2d at 472. As long as class members are allegedly affected by a defendant's general policy, and the general policy is the crux or focus of the litigation, the commonality prerequisite is satisfied. *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 158 (S.D.Ohio 1992), *appeal dism'd without opinion*, 995 F.2d 1066 (6th Cir.1993). Plaintiffs allege the defendants have violated the Americans with Disabilities Act (ADA) because of their failure to modify their facilities, policies, practices and procedures and to administer their services, programs, and activities in the most integrated setting available. Plaintiffs claim this failure impacts all class members and constitutes a barrier towards the entire class. Given that the class members are affected by the general policy and that policy is the focus of this litigation, the Court finds the commonality requirement has been satisfied. *See,* 7A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1763 (1986)(class actions seeking injunctive or declaratory relief often by their very nature present common questions fulfilling commonality requirement except when the propriety of the relief "turns on a consider-

ation of the individual circumstances of each class member or the defendant has not engaged in a common course of conduct toward them").

### c. *Typicality*

The typicality requirement does not focus as much on the relative strengths of the cases of the named and unnamed plaintiffs as it does on the "similarity of the legal and remedial theories behind their claims." *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986). This prerequisite in the settlement context requires "proof that the interests of the class representatives and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement." *Ahearn v. Fibreboard Corp.,* 162 F.R.D. 505, 524 (E.D.Tex.1995)(quoting 2 NEWBERG ON CLASS ACTIONS § 11.28, at 11–58). In fulfilling this element, plaintiffs or class representatives must possess "the same interests and suffer the same injuries as the proposed class." *Celestine v. Citgo Petroleum Corp.,* 165 F.R.D. 463, 467 (W.D.La.1995). This requirement like the commonality requirement is not demanding. *Id.*

Plaintiffs here do not assert claims unique to themselves. Instead, plaintiffs as class representatives have been allegedly adversely affected by the same facilities, policies, practices and procedures as the absent class members. The named plaintiffs are individuals with disabilities who arguably cannot fully participate and benefit from the facilities, services, programs and activities offered by the defendants. These plaintiffs assert injuries in the same general manner as all other class members because defendants allegedly have failed to modify their facilities, policies, practices and procedures to avoid discrimination. Because this case involves a challenge to those facilities, policies, practices and procedures which are said to have failed to provide accessible public transportation in more integrated settings for individuals with disabilities eligible for transportation by VIA rather than a redetermination of each class member's individual claim, any factual difference concerning the specific manner in which different class members may have been injured is of no consequence. Nor is the fact that class members may suffer from different forms of disabling infirmities. Each member of the class contends loss as a result of defendants' alleged failures and each class member has the same interest in pursuing this settlement with the end result being a change or modification of the challenged practices. Accordingly, the typicality standard has been met.

### d. *Adequacy of Representation*

Rule 23(a)(4) requires the class representatives and their counsel to "fairly and adequately protect the interests of the class." To meet this requirement, two elements must be satisfied: (1) concerns regarding the qualifications of counsel and (2) concerns regarding "the relationship between the interests of the class representatives and the interests of other class members." *Ahearn,* 162 F.R.D. at 524 (quoting *Jenkins v. Raymark Indus., Inc.,* 109 F.R.D. 269, 273 (E.D.Tex.1985), *aff'd,* 782 F.2d 468 (5th Cir. 1986)). The Court must be sure there is an absence of conflict and be assured vigorous prosecution. 1 NEWBERG ON CLASS ACTIONS § 3.22, at 3–126.

### Qualifications of Counsel

Plaintiffs' counsel, Advocacy, Incorporated, is a state-wide civil rights organization which has advocated and defended the rights of the mentally retarded, mentally ill, and developmentally disabled in many cases involving discrimination based on disability. Advocacy, Incorporated has successfully prevailed in many ADA and impact litigation actions around the state. The named counsel, Garth Corbett and Geoffrey Courtney, have experience in litigating class actions. The Court had the opportunity to see counsel in action and review the pleadings and other legal memoranda submitted by counsel during the pendency of this case. Mr. Corbett has not only appeared before the Court in this case, but has appeared in another matter and to date, has prevailed in obtaining for his disabled client the relief sought. Counsel has also represented to the Court that it believes its resources are more than adequate to represent the class competently and

that it has no other professional commitments which are antagonistic to, or which would detract from its efforts to secure a favorable decision for the class herein. The Court is confident counsel provided adequate representation for the class.

### Class Representatives

 The second element concerning adequacy of representation concerns the "representativeness" of the class members. This element is satisfied if the class members' "interests are sufficiently aligned with those of the other class members." *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 273 (E.D.Tex.1985), *aff'd*, 782 F.2d 468 (5th Cir. 1986). The Court finds the named plaintiffs satisfy the requirement and have adequately represented the class. All of the named plaintiffs are disabled and have tried to avail themselves of the public transportation system at issue. Margo Neff is a quadriplegic requiring a wheelchair for mobility. Barbara Spear has a visual disability requiring certain accommodations, and Fred Tallmadge is also visually impaired, suffers from a panic disorder, and requires certain accommodations. All three plaintiffs have used the paratransit system and rely on it to travel in and around the city.[1] As set out in *Ahearn*, 162 F.R.D. at 525, "[c]lass representatives satisfy the adequacy requirement unless they have 'an insufficient stake in the outcome or interest antagonistic to the unnamed members.'" Moreover, as long as "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir.1981), *aff'd* 659 F.2d 1322 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294, and *cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982). The Court cannot find any antagonistic interests between class members and unnamed members. Plaintiffs, through counsel, fought to obtain the best

possible recovery for all members. Thus, the class representatives have met the primary standard for determining the adequacy of their representation. *See Gonzales v. Cassidy*, 474 F.2d 67, 75 (5th Cir.1973)(when class representative, through counsel, vigorously and tenaciously protects interests of class, primary standard for determining adequacy of class representative met).

### 2. The Applicable Provision of Rule 23(b)

As previously noted, in addition to complying with the prerequisites of rule 23(a), a putative class action must also satisfy at least one subsection of rule 23(b). These parties seek certification under rule 23(b)(2) requiring the Court to find:

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

FED. R. CIV. P. 23(b)(2).

 The requirement of 23(b)(2) is almost automatically fulfilled in actions where the relief sought is primarily injunctive. *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58 (3rd Cir.1994). However if the appropriate final relief relates solely or chiefly to money damages, a class may not be maintained under this subpart. *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 450 (N.D.Cal.1994). A class of cases found to fall squarely within the category authorized by subpart (b)(2) are civil rights cases which seek "broad declaratory or injunctive relief for a large and amorphous class." *Jeanine B. ex rel. Blondis v. Thompson*, 877 F.Supp. 1268, 1288 (E.D.Wis.1995), *modified*, 967 F.Supp. 1104 (E.D.Wis.1997); *see Arnold*, 158 F.R.D. at 452(Federal Rules Advisory Committee in drafting subpart (b)(2) of rule 23 "cited civil rights cases as the chief category of action for which the (b)(2) category was created").

---

**1.** The Court recognizes that Ms. Spear no longer lives in San Antonio or in Bexar County. However, at the time suit was filed, she lived in the area and had been a rider of VIAtrans since 1985. Moreover, according to Ms. Spear's affi-davit, while she does not currently live in San Antonio, she owns a house here, and it is not unlikely that she will reside in San Antonio again in the future.

It has been said that the hallmark of a rule 23(b)(2) class action is homogeneity. *Arnold,* 158 F.R.D. at 451. It is because of this homogeneity, that courts are allowed to "dispense with notice to the class and bind all members to any judgment on the merits without an opportunity to opt out." *Id.* In addition to homogeneity, some courts identify the cohesiveness of the class as well as the homogeneity of the members' interests as the salient factors to consider. *Id.* at 451–52. The use of these factors was explained as follows:

> Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries. The members of a (b)(2) class are generally bound together through "preexisting or continuing legal relationships" or by some significant common trait such as race or gender. Although the interests of the different members of a (b)(2) class are by no means identical the substantial cohesion of those interests makes it likely that representative members can adequately represent the interests of absent members and that the need for and interest in individual representatives will be minimal.

*Id.* at 452.

■■■ Ms. Neff, Ms. Spear, and Mr. Tallmadge brought this suit seeking only injunctive and declaratory relief for themselves and for those similarly situated who as individuals with disabilities are served or should be served by defendants. Plaintiffs claim that despite their statutory duty to do so, defendants have never provided an accessible public transportation system and have refused and failed to provide plaintiffs and members of the class with appropriate public transportation. The class members are not challenging individual actions taken by defendants against each member individually but are challenging the actions as a whole. It is clear the claims of this class are homogenous and cohesive, and the present action is appropriate for class certification pursuant to rule 23(b)(2). *See Thrope v. Ohio,* 173 F.R.D. 483 (S.D.Ohio 1997)(ADA case wherein class certified pursuant to rule 23(b)(2)); *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439 (N.D.Cal.1994)(ADA case challenging architectural features affecting all class members who were wheelchair-using or semi-ambulatory disabled persons found to be a paradigm of the type of case for which a rule 23(b)(2) class was created).

Accordingly, the Court concludes the class is properly certified.

## II. *FACTUAL BACKGROUND*

On July 26, 1994, plaintiffs Margo Neff and Barbara Spear filed suit against defendant VIA Metropolitan Transit Authority in County Court at Law No. 5, Bexar County, Texas. Plaintiffs claimed the public transportation system provided by VIA was discriminatory as to plaintiffs and individuals with disabilities and violated the ADA and section 504. Plaintiffs claimed VIA was supposed to be in compliance with the ADA on January 26, 1992, and in compliance with section 504 approximately 20 years ago. On August 17, 1994, VIA filed its notice of removal and removed the case to this Court. Approximately one month later, the plaintiffs filed their first amended complaint adding Fred Tallmadge as a named plaintiff and the City of San Antonio has a defendant. The plaintiffs alleged that VIA's special paratransit system, known as VIAtrans, violates the ADA because its reservation system is unusable, customer pickups are often late or missed, and trip requests are often denied. As to VIA's fixed route system, plaintiffs complained that (1) the drivers did not call out bus stops at major bus stops and transfer points; (2) bus stops on the two accessible fixed routes (route numbers 74 and 92) have bus stops that are not accessible to persons with disabilities; and (3) the facilities at VIA's Park and Ride, located at Crossroads Mall, and the VIA Headquarters, located on Myrtle Avenue, are not accessible to persons with disabilities.

On October 14, 1994, the Court held an initial pretrial status conference in the case and advised the parties it would refer the case to mediation. The Honorable Blair Reeves was named mediator October 31, 1994. The parties met on December 12, 1994, for a preliminary meeting to discuss issues and procedures relating to the upcoming mediation. Prior to the mediation, the parties engaged in some discovery which re-

sulted in a motion for protective order to be filed with the Court. Although the parties were able to work out some of the disputes, the motion as to the remaining items as well as plaintiffs' motion for class certification were held in abeyance pending mediation.

On February 25, 1995, plaintiffs filed a proposed settlement agreement. Defendants filed separate responses to the proposed agreement. Thereafter, the first mediation session was held on March 7, 1995, with the result being no settlement but a joint request by the parties to allow them one additional day to again meet with the mediator. The motion was granted with the second mediation session set for April 12, 1995.

Prior to reaching the April 12 date, defendants filed a joint motion asking to postpone the mediation due to the resignation of the former chairman of the VIA Board of Trustees as well as three additional trustees, and the replacement of the vice chairperson and secretary. In addition, the VIA board decided it would not fill the Chairman of the Board position for at least four additional weeks. Therefore, VIA advised it could not mediate the case because it would not have an authority figure to attend the mediation and would not have adequate direction from its Board of Trustees. The allowance of additional time before the next mediation session would also be beneficial because it would allow the parties time to obtain the necessary statistical information needed to continue further mediations. The motion was granted.

The second mediation was held on June 13, 1995. Since the filing of the lawsuit, various motions for summary judgment, partial summary judgment, and a motion for sanctions were filed. The parties asked the Court to hold these motions in abeyance pending the outcome of mediation. Following the second session, the parties requested the Court to order further mediation. In the third request, the parties advised the Court that although an agreement was not reached on all of the outstanding issues in the litigation, the parties believed "significant progress was made in the areas of bus stop and transit facility accessibility, training programs for VIA employees, and training requirements

for private providers of paratransit services. Other issues related to paratransit services were not substantively addressed because of time constraints; a significant amount of time had been spent dealing with issues related to both fixed route and facility accessibility." (Joint Motion to Order Further Mediation (docket # 69)).

By July of 1996, the Court, realizing the case had been in mediation for almost two years, asked to be informed as to the status of the case. The parties provided an Advisory to the Court (docket # 82) apprising the Court they were still pursuing mediation and believed a tentative agreement had been reached on the vast majority of substantive issues pending. The parties believed the final resolution could be reached within 60 days. The Court then stayed the case, dismissed all pending motions without prejudice to refiling if the case did not settle, and required status reports to be filed if the parties were unable to submit a settlement agreement.

As the negotiations continued between the parties, the Court monitored the status of the case. Upon receipt and review of several status reports from the parties, a status conference with all counsel was held March 12, 1997. Counsel reported being optimistic the case would settle but a few items still remained in dispute. Approximately six months later, a second status conference was held to determine just how close the parties were to settling the case and what issues remained unresolved. At that conference, the Court was advised by the plaintiffs that although there was some technical language to be worked out concerning a new automated phone system, they were ready to submit a preliminary order certifying the class, tentatively approving the proposed settlement, and approving the proposed notice to class members. Defendants concurred the parties were basically in agreement but some language and technical problems remained to be resolved.

On October 3, 1997, the parties filed their Preliminary Order Certifying Class, Tentatively Approving the Proposed Settlement, Approving the Proposed Notice to Class Members and, Order Setting Hearing on

Proposed Settlement and memorandum in support thereof (docket numbers 91 & 92). The Court granted this motion October 23, 1997, and set the settlement hearing for January 23, 1998. The order also approved the form of notice to be published in the area newspapers and mailed to those persons certified for VIAtrans service whose names and addresses could reasonably be determined by VIA and to such other persons whose names and addresses could reasonably be determined by plaintiffs. The settlement terms and definitions were set forth, as follows:

### DEFINITIONS

As used in the Settlement Agreement and in the exhibits annexed thereto, in addition to any definitions elsewhere in the Agreement, the following terms have the meanings set forth below:

A. "Agreed Time" is the pick-up time proposed by a VIAtrans customer and accepted by VIA, or proposed by VIA and accepted by a VIAtrans customer, when a VIAtrans customer calls VIAtrans to request a VIAtrans trip.

B. "Americans with Disability Act Accessibility Guidelines" means those guidelines established by the U.S. Architectural and Transportation Barriers Compliance Board entitled "Americans with Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities", published at Vol. 58, No. 144 of the Federal Register, Friday, July 26, 1991, at page 35455.

C. "Business Day" means a day which the administrative offices of the City and VIA are open for business.

D. "City" means the City of San Antonio, Texas.

E. "Contractors" are independent carriers who contract with VIA to provide paratransit service.

F. "Customer" means any person with a disability who uses the VIA fixed route system or the VIAtrans paratransit service provided pursuant to 49 C.F.R. § 37.121.

G. "Eighth Day Data" refers to VIA's standard system of collecting data, including data from driver logs, on an eight day cycle for the purpose of measuring and monitoring VIAtrans service.

H. "Extension from Existing Walk" means, in general, that VIA will construct a concrete pad immediately adjacent and perpendicular to an existing sidewalk, such that the sidewalk and pad will have a combined area sufficient in size to permit the deployment of a bus lift platform and boarding/deboarding by a person using a wheelchair or other similar assistive device.

I. "Fixed Route System" is VIA bus service which follows a predetermined and repetitive route and schedule.

J. "Front Line Employees" are VIA employees who are fixed route and VIAtrans vehicle operators, VIAtrans dispatchers, VIAtrans telephone operators, and customer services representatives.

K. "Missed Trip" means both a paratransit trip where VIA fails to arrive to pick up the VIAtrans customer; and a paratransit trip in which VIA arrives to pick up the VIAtrans customer more than one (1) hour after the agreed time, regardless of the VIAtrans customer's decision to board the vehicle upon arrival.

L. "Non–Subscription Trip" is any VIAtrans trip scheduled one (1) or more days in advance of a specific day, and not to be provided on subsequent days unless again requested by a VIAtrans customer and agreed to by VIAtrans as part of a separate and subsequent trip request.

M. "On-time" means that a vehicle arrives at a scheduled pick up point no more than twenty (20) minutes after the Agreed Time.

N. "Paratransit" is advance-reservation, point-to-point, public transit service.

O. "Same Trip" is defined for these purposes as a trip from the same pick-up point to the same destination on the same day for a pick-up time within the

two hour window of the original request.

P. "Subscription Service" is a service provided by VIA, which is not required under the Acts and is the convenience scheduling of any VIAtrans trip or trips on a regular basis which does not require subsequent trip requests by the customer; and is not a required service under the ADA.

Q. "The Acts" means the Americans with Disabilities Act, 42 U.S.C. § 12132 and 12143, et seq., as amended, the Rehabilitation Act of 1973, 42 U.S.C. § 794 et seq., as amended.

R. "Total Trip Requests" means the sum of all non-subscription trips and all trips provided by subscription service.

S. "Trip Denial" and "Denied Trip" means VIA's refusal or inability to schedule a non-subscription trip within the two hour window, regardless of a VIAtrans customer's decision to accept a trip outside the two hour window.

T. "Two Hour Window" means the time period from one (1) hour before to one (1) hour after the time for which a VIAtrans customer requests a paratransit pickup.

U. "Late Trip" means the arrival of a VIAtrans vehicle to pick up a customer between twenty-one (21) and sixty (60) minutes after the Agreed Time.

V. "VIA" means VIA Metropolitan Transit, its officers, and its employees.

W. "VIAtrans" is VIA's complementary paratransit service.

### TERMS OF SETTLEMENT

**A. Telephone Service Performance Standards**

VIA will meet each of the performance standards set out below. Additionally, VIA will include and publish these performance standards in any policies and procedures or operating standards document relating to telephone service it produces.

1. Definitions. In the context of customer calls to the VIAtrans 362–5050 telephone lines:

a. "Calls Accepted" are calls which are immediately answered by a Trip Reservation Agent without being queued, or which enter a specified call queue before being answered.

b. "Calls Answered" are calls in which the VIAtrans customer either speaks to an Agent or is placed in contact with an interactive electronic telephone answering system.

c. "Calls Abandoned" are calls which enter a queue but are disconnected by the customer before being answered by the Agent.

d. "All legitimate calls" is the sum of the number of calls answered and the number of calls abandoned after two (2) minutes of being accepted.

2. All Calls (ALL) received by VIA from its VIAtrans customers.

VIA's standard of performance is that all calls will be answered within two (2) minutes after being accepted. Such standard of performance is known as the Time Service Factor (TSF).

VIA agrees that at least eighty percent (80%) of all legitimate calls will meet the TSF.

VIA will maintain daily statistics on the total number of legitimate calls (Phone Data).

For each day's Phone Data, VIA will calculate the percentage of calls meeting the TSF by dividing the number of calls answered within two (2) minutes by the number of all legitimate calls.

For the purpose of quarterly reporting, as delineated in Section VI(A) herein, the report will include the monthly averaged percentage of calls meeting the TSF for each of the three (3) months in the quarter.

3. Where's My Ride (WMR) Calls

To promptly resolve problems involving late paratransit vehicles, VIA will handle and investigate telephone inquiries about the whereabouts of a vehicle that is at least twenty (20) minutes late based on the Agreed Time (so called Where's My Ride calls).

VIA will maintain daily statistics on the total number of WMR calls that are addressed/resolved within five (5) minutes of being answered.

For the purpose of quarterly reporting, as delineated in Section VI(A) herein, the report will include the monthly averaged percentage of all WMR calls that were addressed/resolved to within five (5) minutes of being answered for each of the three (3) months in the quarter.

## B. Paratransit Performance Standards

VIA will continue to meet each of the performance standards set out below. Additionally, VIA will include and publish these performance standards in any paratransit policies and procedures or paratransit operating standards document it produces.

1. On-Time Performance

VIA agrees to be "on-time" for at least eighty percent (80%) of all of the VIAtrans trips.

When VIAtrans arrives before the Agreed Time, the customer will not be required to board the VIAtrans vehicle before the Agreed Time.

The on-time performance percentage will be based on pick ups calculated by dividing on-time trips by the sum of on-time trips plus late trips. The statistics used to complete such calculation will be VIA's eighth day data.

For purposes of quarterly reporting, as delineated in Section VI(A) herein, the report will include the average on-time performance rate as calculated by averaging the eighth day data for that quarter.

In addition to on-time performance data requirements, data on late trips will also be compiled. Data on late trips will be calculated from each set of eighth day data. Two rates based on all trips will be calculated as follows:

a. Trips where the pick-up is between twenty-one (21) and forty (40) minutes after the agreed time.

b. Trips where the pick-up is between forty-one (41) and sixty (60) minutes after the agreed time.

For the purpose of quarterly reporting, as delineated in Section VI(A) herein, the report will include the averaged late trip rates of the two categories based on the average of the eighth day data for all days of that quarter.

2. Missed Trips

VIA agrees to maintain a performance standard such that the percentage of VIAtrans trips considered missed trips will be no more than three and one-half percent (3.5%) of all the VIAtrans trips. The missed trip percentage will be calculated by dividing the number of missed trips by the total number of VIAtrans trips. The statistics used to complete such calculation will be VIA's eighth day data.

3. Trip Denials

VIA agrees that it will maintain a performance standard such that the percentage of casual (i.e., non-subscription) trip requests denied shall not exceed ten percent (10%) of the total trip requests received during VIAtrans trip reservation hours and at least one day in advance.

VIAtrans will maintain daily records of casual trip requests both approved and denied. Weekday (Monday through Friday) data will be recorded in time increments of 5:00—8:59 AM, which is the AM Peak period; 9:00 AM—1:59 PM, which is the Base period; 2:00—4:59 PM, which is the PM Peak period; and 5:00—11:59 PM, which is the Night period. Weekend (Saturday & Sunday) data will not be recorded in time increments, but will be merged and approvals and denials will each be reported as a single number. This data will be reported quarterly [as per Section VI(A) of the Proposed Settlement Agreement].

A trip denial rate, by the above weekday time increments and for weekends, will be calculated quarterly and computed as follows: casual trip requests denied, divided by the sum of casual trip requests both denied and approved. Prior to a requested trip date, multiple requests by the same person for the same trip will, if accepted or denied by VIA prior to the

requested trip date, be recorded as only one (1) trip requested.

The parties agree that an average quarterly casual trip denial rate of ten percent (10%) or less for any weekday service period or for the weekend, shall not constitute a pattern or practice of significantly limiting the availability of service to ADA paratransit eligible persons. The parties further agree that a rate in excess of ten percent (10%) does not necessarily indicate the existence of a pattern or practice of significantly limiting the availability of service to ADA paratransit eligible persons.

4. Excessive Trip Lengths

VIA will respond in writing, within fourteen (14) days, to customer complaints of excessive VIAtrans trip lengths, provided that (a) the trip in question was sixty (60) minutes or longer; (b) sufficient information (such as origin/destination and date) is provided by the customer; and (c) a written reply is requested by the customer. For purposes of quarterly reporting as delineated in Section VI(A) herein, VIA will provide copies of all complaints of excessively long trips which are over sixty (60) minutes in duration, along with copies of the corresponding investigation and response to such complaints. This information may be redacted to maintain the anonymity of the complainant.

In addition, VIA will tabulate customer complaints of excessive VIAtrans trip lengths which are less than sixty (60) minutes in duration, provided that the complaint is in writing or registered by telephone with VIA's customer service department. For purposes of quarterly reporting, as delineated in Section VI(A) herein, VIA will provide Plaintiffs' counsel with the number of such customer complaints.

A VIAtrans trip may be considered excessively long if it required measurably more time than a comparable trip on the VIA fixed-route bus system. Comparable fixed-route travel time includes access time to a bus stop; wait time at a bus stop; time on board a bus; transfer time to another bus and time on board another bus, if necessary to complete the trip; and access time at the destination.

C. **Bus Stop Accessibility**

The parties have classified, for purposes of this Agreement, the bus stops on VIA Routes 74 and 92 as either high priority, medium priority or low priority stops. A list of these designations is attached as Exhibit A to the Settlement Agreement. VIA and the City agree to take the following action with respect to these bus stops.

1. High Priority Stops

VIA will take action and perform the work with respect to all bus stop pad and shelter problems as set forth on Exhibit B attached to the Settlement Agreement and incorporated therein within twelve (12) months of Court approval of this Agreement.

The City will take action and perform the work necessary with respect to curb cuts and sidewalks (within the City limits) as set forth on Exhibit B attached to the Settlement Agreement within twelve (12) months of Court approval of this Agreement.

2. Designated Medium Priority Stops

Within six (6) months of execution and Court approval of this Agreement, the City and VIA will designate up to fifteen (15) medium priority stops which are listed on Exhibit A attached to the Settlement Agreement as needing work and shall perform the work deemed necessary by VIA and the City to render said stops accessible within the following twenty-four (24) months after designation.

3. Remainder Medium and Low Priority Stops

The City and VIA will establish procedures within their liaison committee (see Paragraph V.(H)) within six (6) months of Court approval of this Agreement to respond to VIA customer complaints concerning wheelchair accessibility to the remaining medium and low priority stops on Routes 74 and 92 and located in the City of San Antonio. These procedures will do the following:

a. Insure that the liaison committee receives such complaints and considers them.

b. Require the City and VIA to decide within ninety (90) days of receipt of any such complaint by the liaison committee whether work will be done at any stop to resolve the complaint.

c. If both the City and VIA agree that such work will be performed at any given stop, the procedures shall require that such work will be completed within fifteen (15) months of the time that decision is made.

d. However, these complaint procedures will not be applicable to those high and medium priority stops which have been otherwise dealt with in the Agreement.

## D. Facilities Architectural Modifications

1. Crossroads Park and Ride Accessibility

VIA agrees to make the following modifications and additions to the Crossroads Park and Ride facility within six (6) months of the first day of the first VIA fiscal quarter following the execution of this Agreement.

VIA will move its accessible parking spaces so that a sufficient number of parking spaces are provided on both the north and the south sides of the transit facility. These accessible parking spaces will be located so that they are as close to the accessible entrance of the transit facility as possible, located on the most level landing surface. VIA will install appropriate signage for these spaces. The accessible parking spaces will be modified so as to comply with the Americans with Disabilities Act Accessibility Guidelines.

Crosswalks will be painted with a highly contrasting paint.

The bus stop shelters for the 74/92 line will be modified to provide for a wheelchair space underneath the awning.

The ramp at bus stop # 3216–W will be repaired and/or regraded to ensure that it meets the 1:12 maximum slope requirement.

The entrance on the westerly side of the building will be modified with an automatic opening device which complies with the Americans with Disabilities Act Accessibility Guidelines. Appropriate signage will be installed to identify this entrance as the accessible entrance.

Fire extinguishers will be recessed into the wall so as not to intrude into the accessible path of travel as outlined in the Americans with Disabilities Act Accessibility Guidelines.

VIA will formally request that Southwestern Bell Telephone modify the public telephones so that they are lowered such that a person in a wheelchair can reach and use the telephones. VIA will report to Plaintiffs' counsel: (a) whether Southwestern Bell agreed, and (b) if so, when the modifications are complete.

Two (2) wheelchair spaces will be identified in the waiting area, and wheelchair spaces will be created at the snack tables by installing a new table that will accommodate wheelchair clearance for at least two (2) spaces at the table.

Lavatory counters will be modified or replaced so as to comply with the Americans with Disabilities Act Accessibility Guidelines.

Electric hand dryers will be lowered so as to comply with the Americans with Disabilities Act Accessibility Guidelines.

Toilet paper dispensers will be relocated and new stall latches installed so as to comply with the Americans with Disabilities Act Accessibility Guidelines.

2. 800 West Myrtle Street Accessibility

VIA agrees to make the following modifications and additions to the VIA Headquarters at 800 West Myrtle Street within six (6) months of the first day of the first VIA fiscal quarter following the execution of this Agreement.

VIA will install a drinking cup dispenser adjacent to the drinking fountain in the main lobby of the Administration building. The dispenser will be installed so

as to comply with the Americans with Disabilities Act Accessibility Guidelines.

Signage will be installed in the main lobby of the Administration building directing people's attention to the accessible restrooms on the second floor.

The elevator shall be modified such that the call buttons will be lowered, an audible bell will be added to the door opening/closing operation, and the electric door reopening device will be modified. Hoistway jamb floor numbers will be installed. These modifications will be completed so as to comply with the Americans with Disabilities Act Accessibility Guidelines.

In the designated bathrooms, lavatory tops will be modified to accommodate 29″ knee clearance. Under-counter plumbing will be insulated. The lavatory faucets will be changed to a lever type.

In the designated bathrooms, mirrors will be lowered so as to comply with the Americans with Disabilities Act Accessibility Guidelines.

The partition between the urinals in the men's bathroom will be moved so as to comply with the Americans with Disabilities Act Accessibility Guidelines.

The latches on the stalls will be changed to accessible types so as to comply with the Americans with Disabilities Act Accessibility Guidelines.

**E. Training of Personnel**

VIA will ensure that Front–Line Employees are trained to properly assist and treat individuals with disabilities in a respectful and courteous way. In addition, VIA will also ensure that vehicle operators are trained to operate vehicles and equipment safely and properly.

1. Initial and Refresher Training for Front Line Employees.

 a. VIA's initial training programs will continue to include a four (4) hour training module for its front-line employees on being sensitive and responsive to persons with disabilities.

 b. VIA agrees, by the end of each calendar year, to review, update, and obtain revised and/or new sensitivity training materials developed by Project Action, National Easter Seal Society, in Washington, D.C., for possible inclusion by VIA's training staff in its initial and refresher training courses.

 c. VIA agrees that it obtained additional material for evaluation and for possible inclusion into all training materials, by contacting Project Action, National Easter Seal Society, in Washington, D.C., and that it has included such material deemed appropriate.

2. Bus Stop Announcement Training

 a. VIA agrees to conduct an "ADA Bus Stop Announcement Sensitivity Training" class, similar to that presented to transit personnel in Pittsburgh, PA, and Cleveland, OH, during January and February 1997, as sponsored by Project Action. The length of the class will not exceed two (2) working days and will involve participation by no more than twelve (12) VIA Bus Operators and twelve (12) local persons with disabilities who benefit from bus stop announcements. Operators and persons with disabilities will be selected by VIA, using criteria provided by Mr. Jim Flemming of JDF and Associates and as appropriate to the conduct and content of this class. The class activities will be observed by one or more VIA training and/or supervisory employees as selected by VIA.

 The class will be conducted at VIA by Mr. Flemming and one (1) assistant designated by Mr. Flemming. Costs associated with such training shall be born by VIA and/or Plaintiff's counsel as set forth in the "Agreement for Attorneys' Fees and Training Costs", entered into by all parties by and through their respective counsel and incorporated herein by reference.

 The class as described herein will be conducted on or before October 1, 1997. VIA agrees to subsequently evaluate the usefulness and benefit of this class but reserves all rights to decide the extent, if any, to which the

class will be offered or provided to VIA employees in the future.

b. By November 1, 1997, and continuing at regularly scheduled intervals, VIA's field supervisors will evaluate all fixed routes to ensure vehicle operators announce all major stops consistent with VIA training requirements. VIA's driver performance evaluation form used for such purposes will be updated to include an area which will allow field supervisors to make formal reports on bus stop announcement. A copy of such form shall be provided to Plaintiffs' counsel on or before November 15, 1997. VIA shall provide a written statement to Plaintiffs' counsel affirming that such form has been used in evaluating its bus drivers prior to the time of the Court's dismissal of all allegations contained in the litigation related to training of personnel as provided for in Section X(2) of this Agreement.

3. Contract Providers

a. Beginning May 1, 1997, VIA will require that new contract providers ensure both new and current employees providing transportation services to persons with disabilities receive the training materials VIA's training department personnel use and provide training to its employees at intervals that are comparable with the training schedule VIA utilizes to provide initial and refresher training to its employees.

b. Existing contract providers will use VIA's training materials and schedules to the fullest extent required under the terms of the existing contract(s).

Beginning May 1, 1997, contracts for taxi services in support of VIAtrans, which do not exceed five percent (5%) of all monthly VIAtrans trips, shall not be subject to the provisions of V(E)(3)(a) herein, provided taxi vehicle operators meet all requirements imposed by the City of San Antonio.

4. Training Component

VIA will continue to maintain components for training in the following areas: vehicle lifts, facilitated communication equipment, and vehicle operator training. Copies of all materials/syllabi/lesson plans VIA currently uses in course training for vehicle lifts, facilitated communication equipment, and vehicle operator training will be provided to Plaintiffs' attorney as part of this settlement agreement. VIA also agrees to provide copies of all updates to these training components in accordance with Section VI(A)(4) of this Agreement.

**F. Communications to the Disabled Public**

VIA will maintain a telecommunication device for the deaf transit information line and advertise this line in all VIA publications.

Material pertinent to the VIAtrans eligibility process and VIAtrans operating policies will be made available in accessible formats, including large print, Braille, audio cassette, and computer disk. Persons who are deaf can also contact VIA by using Relay Texas.

**G. Public Participation**

VIA will continue to ensure public participation in the development of transit plans and the development and assessment of services to persons with disabilities according to 49 C.F.R. § 37.137. VIA's efforts may include: mailings to all eligible VIAtrans riders, and to agencies which advocate for and serve persons with disabilities; hosting meetings of the VIA/MPO Special Services Advisory Committee (SSAC) or any other public participation group as allowed under 49 C.F.R. § 37.137c; and hosting public hearings as part of annual paratransit plan updates.

The VIA Board will allow the Chair or, as appropriate, the Vice Chair of either the VIA/MPO Special Services Advisory Committee (SSAC) or any other public participation group as allowed under 49 C.F.R. § 37.137c, at VIA's discretion to report on at least a bi-monthly basis (every two months) on all recommendations made by the SSAC.

## H. Liaison Committee

VIA and the City will each designate one or more representatives to serve on a VIA–City liaison committee within sixty (60) days of the Court's approval of this Agreement to assist the City and VIA in complying with this Agreement and improving the public transportation system for individuals with disabilities who utilize the system. The mission of the liaison committee will be to provide an ongoing forum to enable VIA and the City to:

1. Coordinate planning efforts on issues which impact fixed route accessibility.

2. Plan fixed route accessibility across the City.

3. Receive and consider the customer complaints referenced in Paragraph V(C) of the Agreement.

## *REPORTING*

### A. VIA's Obligations

1. General

Within ten (10) days after execution of the Agreement, VIA will inform all VIA employees and contractors of the provisions of this Settlement Agreement.

2. Paratransit Performance

a. VIA's obligation to make paratransit performance reports to Plaintiffs' counsel will begin at the conclusion of the first VIA fiscal quarter after the execution of the Settlement Agreement.

b. No later than fifteen (15) days after the end of each VIA fiscal quarter, VIA will provide to plaintiffs' counsel a written report that includes the following information:

(1) For each of the performance standards in Section V(A) and (B), VIA will report their performance for that quarter and will include all data used to determine performance level.

(2) If VIA's performance in any area does not meet or exceed the performance standard, the report will include answers to the following questions:

a) What is (are) the reason(s) for VIA's inability to meet the standard?

b) What steps have been taken to insure that future performance satisfies the standard?

c) If VIA expects that it will not be in compliance by the end of the next fiscal quarter, please explain why.

c. If statistics and their accompanying data are unavailable for any paratransit performance standard, VIA will have failed to satisfy that performance standard for that particular quarter.

d. Once VIA remains in compliance for four (4) consecutive quarters for each and any of the paratransit performance standards set forth in Section V(A) and (B) herein, VIA will have met its obligation under this Settlement Agreement as it relates to that particular standard and all reporting on that particular standard shall cease.

e. VIA will not destroy the data and records required to be maintained pursuant to Section V for at least three (3) years after achieving compliance.

3. Accessibility Issues

a. VIA's obligation to make bus stop improvement status reports to Plaintiffs' counsel will begin at the conclusion of the first VIA fiscal quarter after the execution of the Settlement Agreement.

b. No later than fifteen (15) days after the end of each VIA fiscal quarter, VIA will provide to Plaintiffs' counsel written reports that include the following information:

(1) Information indicating which modifications and additions have been completed.

(2) If modifications and additions have not been performed as per the timetable, the report will include answers to the following questions:

(a) What is (are) the reason(s) for the inability to meet the timetable?

(b) What steps have been taken to insure that incomplete modifications and additions will be completed promptly?

(c) If VIA expects that it will not be able to complete the scheduled modifications and additions by the end of the next fiscal quarter, please explain why.

c. For each of the modifications and additions listed in Section V(C), (D) and (E), once VIA has completed all such modifications consistent with the agreed-upon timetable for completion, VIA will no longer be required to report on that element and for the purposes of the Settlement Agreement, VIA will have met its obligations relative to such improvements.

4. Training Issues

a. No later than fifteen (15) days after the end of each of VIA's fiscal quarters, VIA will provide to Plaintiffs' counsel a written report regarding any changes to the training materials and efforts to comply with Section V(E).

b. All reporting requirements relating to Section V(E)(1)-(4) shall cease at the earlier of the dismissal of this litigation; or after VIA has supplied reports for four (4) consecutive quarters which indicate compliance with Section V(E)(1)-(4).

## B. The City's Obligations

The City will provide written notice to Plaintiffs' counsel within thirty (30) days of the time within which it has completed each of the following obligations under the Agreement.

1. Completion of the work on curb cuts and sidewalks at high priority stops, as set forth in Paragraph V(C) hereof.

2. Completion of the designation, by the City and VIA, of up to fifteen (15) high-use medium priority stops needing work to render said stops wheelchair accessible, as set forth in Paragraph V(C) hereof.

3. Designation of the City's Liaison Committee representative(s), as set out in Paragraph V(H) hereof.

4. Establishment by the City and VIA of procedures to respond to customer complaints, as set out in Paragraph V(C) hereof.

## MODIFICATION TO PERFORMANCE STANDARDS AND INFORMAL DISPUTE RESOLUTION PROCEDURE

In the event of severe budgetary cutbacks and constraints on a federal, state, and/or local level which severely impact VIA's operations, VIA may petition the Court for relief from the Settlement Agreement after providing thirty (30) days' notice to Plaintiffs' counsel.

In the event the ADA and/or Section 504 are amended or the implementing Regulations and/or Rules promulgated thereunder are amended to require or allow a lesser standard or standards for complementary paratransit service and/or fixed route bus service accessibility than is required by the Settlement Agreement, VIA and/or the City may adopt such lesser standards without violating the terms and conditions of the Agreement.

In the event VIA and/or the City, for two straight quarters, fails to provide information agreed upon in the Agreement, or fails to comply with the performance standards, deadlines, or other requirements that are part of the Agreement, the parties shall undertake informal measures to resolve the issue prior to any Court intervention.

Such informal measures shall begin with the Plaintiffs notifying VIA and/or the City in writing of any allegations of VIA's and/or the City's non-compliance with any of the terms and conditions of the Settlement Agreement. VIA and/or the City will respond in writing to Plaintiffs' counsel within ten (10) business days. Plaintiffs' counsel shall review such response and reply, in writing, within ten (10) business days by either accepting or rejecting each item enumerated in the response. Upon receipt of the reply, VIA and/or the City shall contact Plaintiff's counsel by telephone or in person, within five (5) business days of receipt of such reply to either finally resolve all outstanding issues or, if the alleged issues are not resolved, schedule a face-to-face meeting to negotiate a resolution of the outstanding issues. If such a face-to-face meeting is necessary to resolve

outstanding issues, Plaintiffs' counsel, VIA, and the City shall meet within twenty (20) calendar days of the date of such telephone contact in an attempt to resolve the identified issues in a mutually acceptable manner. All parties will make a good faith effort to resolve the identified issues. Only if the informal process fails, and a resolution on the identified issues is not achieved, may the Plaintiffs reinstate litigation on the outstanding issues alleged or bring the situation to the attention of the Court through an appropriate proceeding.

1. *Telephone Service Performance Standards.* VIA's standard of performance is that all calls will be answered within two (2) minutes after being accepted. Such standard of performance is known as the Time Service Factor (TSF). VIA agrees that at least eighty percent (80%) of all legitimate calls will meet the TSF. VIA will maintain daily statistics on the total number of legitimate calls (Phone Data). For each day's Phone Data, VIA will calculate the percentage of calls meeting the TSF by dividing the number of calls answered within two (2) minutes by the number of all legitimate calls. For the purpose of quarterly reporting, the report will include the monthly averaged percentage of calls meeting the TSF for each of the three (3) months in the quarter.

 To promptly resolve problems involving late paratransit vehicles, VIA will handle and investigate telephone inquiries about the whereabouts of a vehicle that is at least twenty (20) minutes late based on the Agreed time (so called Where's My Ride (WMR) calls). VIA will maintain daily statistics on the total number of WMR calls that are addressed/resolved within five (5) minutes of being answered. For the purpose of quarterly reporting, the report will include the monthly averaged percentage of all WMR calls that were addressed/resolved to within five (5) minutes of being answered for each of the three (3) months in the quarter.

2. *Paratransit Performance Standards.* VIA agrees to be "on-time" for at least eighty percent (80%) of all of the VIA-trans trips. When VIAtrans arrives before the agreed time, the customer will not be required to board the VIAtrans vehicle before the agreed time. The on-time performance percentage will be based on pick ups calculated by dividing on-time trips by the sum of on-time trips plus late trips. The statistics used to complete such calculation will be VIA's eight day data. For purposes of quarterly reporting, the report will include the average on-time performance rate as calculated by averaging the eighth day data for that quarter.

In addition to on-time performance date requirements, data on late trips will also be compiled. Data on late trips will be calculated from each set of eighth day data. Two rates based on all trips will be calculated as follows:

a. Trips where the pick-up is between twenty-one (21) and forty (40) minutes after the agreed time.

b. Trips where the pick-up is between forty-one (41) and sixty (60) minutes after the agreed time.

For the purpose of quarterly reporting, the report will include the averaged late trip rates of the two categories based on the average of the eighth day data for all days of that quarter.

VIA agrees to maintain a performance standard such that the percentage of VIAtrans trips considered missed trips will be no more than three and one-half percent (3.5%) of all the VIAtrans trips. The missed trip percentage will be calculated by dividing the number of missed trips by the total number of VIAtrans trips. The statistics used to complete such calculation will be VIA's eighth day data.

VIA agrees that it will maintain a performance standard such that the percentage of casual (i.e., non-subscription) trip requests denied shall not exceed ten percent (10%) of the total trip requests received during VIAtrans trip reservation hours and at least one day in advance. VIAtrans will maintain daily

records of casual trip requests both approved and denied.

The Court has reviewed the proposed settlement terms as set forth above. Notwithstanding the numerous complaints and objections to the operation of the paratransit service which prompted the lawsuit, no objections to the settlement agreement were received. The settlement agreement was widely advertised via direct mail and published notice to tens of thousands of disabled patrons.

### III. *STANDARD OF REVIEW*

#### A. SETTLEMENT OF CLASS ACTION

■■■ Rule 23(e) of the Federal Rules of Civil Procedure provides no standard by which a court is to consider the settlement of a class action. Rather, the rule states:

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

"Decisional law, however, provides us with a general measuring rod for considering settlements:

In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable.

Approval of the settlement under this standard is not to be upset unless 'the trial court clearly abused its discretion.'" *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir.1981), *aff'd*, 659 F.2d 1322 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294, and *cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982). The general rule applicable to the court's exercise of its discretion in deciding the fairness of a proposed class action is that the court must "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *In re Shell Oil Refinery*, 155 F.R.D. 552, 559 (E.D.La.1993). In addition, the court acts "as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Morales v. Turman*, 569 F.Supp. 332, 337 (E.D.Tex.1983). However, the court cannot modify the terms of the proposed settlement; rather, the court must approve or disapprove of the proposed settlement as a whole. *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 527 (E.D.Tex.1995). There is a strong presumption in favor of finding the settlement fair. *Id.* The proposed settlement is not required to "achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation." *Id.* at 527–28. Compromise is the essence of settlement, and the court may rely on the judgment of experienced counsel for the parties. *Id.* at 528.

■■■ In assessing whether a settlement is "fair, adequate and reasonable," the Fifth Circuit has stated six key points or *Reed* factors should be considered. These factors are:

1. the existence of fraud or collusion behind the settlement;

2. the complexity, expense, and likely duration of the litigation;

3. the state of the proceedings and the amount of discovery completed;

4. the probability of plaintiffs' success on the merits;

5. the range of possible recovery; and

6. the opinions of the class counsel, class representatives, and absent class members.

*Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983); *see Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 528 (E.D.Tex. 1995)(court used these factors in assessing the fairness of the settlement). In applying these factors, the Fifth Circuit has admonished courts to be mindful of the "overriding public interest in favor of settlement" in class action suits. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977).

## B. THE *REED* FACTORS

### 1. *The Existence of Fraud or Collusion Behind the Settlement*

■ Having held several conferences with all parties, the Court finds no evidence of any fraud or collusion behind the settlement but finds the settlement was the result of hard fought, arm's length negotiations. In addition to experienced plaintiffs' counsel, defendant VIA was expertly represented by Warren Weir of Weir & Alvarado, P.C. and Bridgette Sopper Oliva of Butler & Binion. Defendant City of San Antonio was represented by Terry S. Bickerton and Steve Arronge. Undisputedly, all parties are vigorously represented. Although settlement negotiations began at an early stage in the case, it took over three years and many mediation sessions to resolve the issues. The Court heard from the mediator, the three named plaintiffs, two unnamed members of the class as well as the VIA board chairman and representatives of the City of San Antonio. All unanimously agreed the settlement was a good compromise and all asked the Court to approve it. Finding no evidence to the contrary, the Court finds the settlement free of fraud or collusion.

### 2. *The Complexity, Expense, and Likely Duration of the Litigation*

Having previously reviewed the history of this litigation, there is no doubt this case is procedurally and substantively complex. Were the case to proceed to trial, all motions previously held in abeyance pending settlement would be reurged. One such motion was a request by defendant City of San Antonio seeking to move for the joinder of additional parties. If the motion were to be granted, additional time for discovery would be allotted, and this now three-year-old case would grow even older before being ready for trial. In addition, given the complexity of the issues and this Court's criminal docket, it is uncertain when the parties could expect a trial without interruption. Not only would the trial consume court resources, the case would also be subjected to lengthy appeals. One court put this perspective on the issue:

> [t]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'

*In re Shell Oil Refinery,* 155 F.R.D. 552, 560 (E.D.La.1993)(quoting *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597, 624 (D.Colo. 1974)). The Court is satisfied this factor is met.

### 3. *The Stage of the Proceedings and the Amount of Discovery Completed*

■ The extent of discovery needed in order for the parties to have sufficient information to make an informed and reasoned evaluation of the settlement and for the Court to be able to determine the fairness and adequacy of the compromise is left to the discretion of the Court. *See Cotton v. Hinton,* 559 F.2d 1326, 1332–33 (5th Cir. 1977). Sufficiency of information does not depend on the amount of formal discovery that has been taken because other sources of information may be available to show the settlement may be approved even when little or no formal discovery has been completed.[2] *Id.* Additionally, a court may consider information available to the parties which was developed in prior or related proceedings. *See Ahearn v. Fibreboard Corp.,* 162 F.R.D. 505, 528 (E.D.Tex.1995)(factual and legal is-

---

**2.** The Fifth Circuit in *Cotton v. Hinton,* expressed concern that many litigators hold the common belief that great amounts of formal discovery must be taken in each case. The court explained:

> We have often seen cases which were "over discovered." In addition to wasting the time of this Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a

vehicle to harass a party. Discovery in its most efficient utilization should be totally extra-judicial. The Court should rarely be required to intervene. Being an extra judicial process, informality in the discovery of information is desired. It is too often forgotten that a conference with or telephone call to opposing counsel may often achieve the results sought by formal discovery.

*Cotton,* 559 F.2d at 1332.

sues identified and developed through extensive litigation; class counsel thoroughly familiar with asbestos litigation in general).

During the time this case has been in litigation and/or mediation, some three and one-half years, the parties engaged in extensive discovery including depositions, document review, and consultation with experts. Plaintiffs presented the affidavits of two experts, Robert Bruce Klug and Harold Jenkins, to the Court at the fairness hearing. Mr. Klug is an architect and evaluated the physical accessibility of VIA's bus stops and physical facilities and determined that many of the bus stops and facilities did not meet the Americans with Disabilities Architectural Access Guidelines. Mr. Jenkins evaluated service issues concerning the scheduling of pickups, capacity constraints, excessive trip length, inadequate training, and the failure to announce bus stops on fixed routes. Both experts reviewed the proposed settlement agreement and concur that the implementation of this agreement will provide the disabled community with reliable and accessible transit services. Defendants also provided exhibits indicating its financial ability to implement the settlement. Unquestionably, the parties have adequate information from which to decide whether to settle the case, and the Court has ample information from which to decide if the settlement is fair, adequate and reasonable.

### 4. The Probability of Plaintiffs' Success on the Merits

■ Once the issue of possible fraud or collusion behind the settlement is removed, the next most important factor in deciding the fairness, adequateness, and reasonableness of the settlement is the likelihood of plaintiffs' success on the merits if the case were to proceed to trial. *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982). In making this determination, the court must compare the terms of the settlement with the "likely rewards the class would have received following a successful trial of the case." *Reed v. General Motors Corp.,* 703 F.2d 170,

172 (5th Cir.1983). However, the court is not to decide the issues or try the case via the fairness hearing because, "[t]he very purpose of the compromise is to avoid the delay and expense of such a trial." *Id.* (quoting *Young v. Katz,* 447 F.2d 431, 433 (5th Cir.1971)).

Although each side still vigorously believes it will prevail if the case proceeds to trial, both sides recognize the uncertainty of litigation. Plaintiffs and defendants presented to the Court their perspective on the case. Plaintiffs believe the settlement gives them much of what they originally asked for in their complaint and constitutes a significant step toward ensuring defendants' public transportation system provides meaningful access and service to persons with disabilities.

Keeping in mind the Court is not to try the case or decide the issues, the Court finds sufficient risk to each side that the outcome of continued litigation is unpredictable and the substantial risk to each side as to the ultimate outcome strongly favors settlement.

### 5. The Range of Possible Recovery

■ In determining whether the settlement is reasonable in light of the range of possible recovery factor, the Court is to "determine the value of the settlement in light of the potential for recovery." *In re Shell Oil Refinery,* 155 F.R.D. 552, 563 (E.D.La.1993). This analysis requires the Court to "establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors,[3] determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors." *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 213 (5th Cir.1981), *aff'd,* 659 F.2d 1322 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294, and *cert. denied,* 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982).

As in *Maher v. Zapata Corp.,* 714 F.2d 436, 460 (5th Cir.1983), the proponents of settlement here did not provide this Court

---

**3.** Factors that the court considered potentially relevant were "the complexity, expense and likely duration of the litigation..., the reaction of the class to the settlement; [and] the stage of the

proceedings...." *In re Corrugated Container Antitrust Litig.,* 643 F.2d at 217 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d at 453 (2d Cir.1974)).

with an "express estimate of the range of possible monetary recovery should plaintiffs prevail at trial." The Court, however, was provided with arguments from each side concerning their respective positions on the merits of the asserted claims, the risks associated with continued litigation, and the advantages to and value of the settlement. Moreover, the recovery sought in this case is purely declaratory and injunctive relief.

All parties and the mediator have agreed the settlement is a reasonable balance between the needs of disabled patrons and the budgetary constraints of the public treasury. Moreover, the avoidance of future litigation is contemplated by the implementation of the Agreement because once the case is dismissed the ADA will be enforced by the action of defendants without the necessity of litigation or court supervision. Another important provision of the Agreement is the liaison committee in which representatives from the defendants provide an "on-going forum" to continue to work with the problems. Of course, this Court recognizes the recovery range of a jury verdict could be more or less depending upon how the jury perceives the evidence and the costs and expenses incurred in continuing the litigation to trial. *In re Shell Oil Refinery,* 155 F.R.D. 552, 565 (E.D.La.1993). The calculation of the possible range of recovery cannot be mathematically precise. *Id.* This Court finds that based on the evidence heard and its experience in conducting trials, the settlement in accordance with the terms set forth in the proposed settlement are within the range of possible recovery.[4]

6. *The Opinions of Class Counsel, Class Representatives, and Absent Class Members*

a. *Opinions of Class Counsel and Class Representatives*

The settlement was presented to the Court after long, hard-fought negotiations between the parties; both sides endorse the settlement. In reviewing the opinions of counsel, the Court is to bear in mind that counsel for each side possess the unique ability to "assess the potential risks and rewards of litigation, and a presumption of correctness is said to attach to a class settlement reached in arms [sic] length negotiations between experienced, capable counsel after meaningful discovery." *Lelsz v. Kavanagh,* 783 F.Supp. 286, 297 (N.D.Tex.1991)(quoting MANUAL FOR COMPLEX LITIGATION § 30.41), *aff'd,* 983 F.2d 1061 (5th Cir.), *cert. denied,* 510 U.S. 1004, 114 S.Ct. 581, 126 L.Ed.2d 480 (1993). As to the class representatives, the Court heard testimony from all three named plaintiffs and two class members as well. All explained to the Court the various problems they encountered with the public transportation system, all affirmed they reviewed the settlement, and all agreed the settlement should be approved by the Court. Affidavits from each witness were also submitted to the Court. In addition to these witnesses, the Court received an audio cassette recording from Mr. Tom Nevins, a legally blind disabled veteran. On his tape, Mr. Nevins explains the difficulties he has had with the public transportation system including his experience that VIA is the only transportation system which uses a minivan with a footstool for its passengers and receives the most complaints about its system. As previously mentioned, the settlement was also supported by the mediator.

b. *Opinions of Absent Class Members*

 In addition to the opinions of class counsel and class representatives, the Court is also to consider the opinions of absent class members. In doing so, the Court should carefully weigh the number and nature of objections while keeping in mind the settlement can be fair even if a large

4. The Fifth Circuit has agreed with comments by the Second Circuit in its confirmation of a settlement which resulted in recovery of only 12% of the potential recovery. In this opinion, *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2nd Cir.1974), the Second Circuit stated:

The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.

*Parker v. Anderson,* 667 F.2d 1204, 1210 n. 6 (5th Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

number of class members oppose it. *Reed v. General Motors Corp.*, 703 F.2d 170, 174 (5th Cir.1983). The Court should also recognize that "a low level of vociferous objection is not necessarily synonymous with jubilant support[,]" but great support for the settlement can certainly be a factor favoring approval. *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir.1981), *aff'd*, 659 F.2d 1322 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294, and *cert. denied*, 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982); *see Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977)(in assessing fairness of proposed settlement, number of objectors is factor to consider but not controlling). The number of objectors should be considered carefully. *Reed*, 703 F.2d at 174.

Despite notice, no objections were received. At the settlement hearing, the Court received the affidavit of Marion Stringer, the Director of Customer Service at VIA, and the affidavit of Sylvia Mendiola, the Manger of Community Relations at VIA. Ms. Stringer oversees the Accessibility Division of the Customer Service Department and was asked to and coordinated the mailing of the Notice of Proposed Settlement of Class Action approved by the Court. Although the settlement agreement stated VIA would provide a list of persons to plaintiffs' counsel for the mailing of notices, out of courtesy to plaintiffs' counsel and because VIA was sending other written material to its VIAtrans patrons, VIA took responsibility for mailing the notice to all persons currently registered for VIAtrans service. Ms. Stringer states:

> Therefore, please be assured that VIA Metropolitan Transit mailed said Notice to all of it's [sic] VIAtrans patrons in written English format, and in alternative formats, such as written Spanish, large print, Braille, and recorded message, as directed by individual patron's needs as set forth in their VIAtrans patron information sheet on record at VIA Metropolitan Transit.

Ms. Mendiola advised the Court she coordinated the publication of the Notice of the Proposed Settlement of Class Action. She states:

In that regard, VIA Metropolitan Transit, by and through my efforts, ensured that such Notice was published as follows: in English in five daily issues of *The San Antonio Express–News*, one weekly issue of *The Current* and *The Reporter*, and in Spanish in one weekly issue of *La Prensa*. Publication in *The San Antonio Express–News* was from November 17, 1997 to November 21, 1997, *The Current* on or about December 11, 1997, *The Reporter* on or about December 11, 1997, and in *La Prensa* on or about November 16, 1997.

The notice advised the members of the proposed class they did not need to appear at the hearing if they were satisfied with the proposed settlement but could do so. The notice further advised settlement class members who intended to object to the fairness of the proposed settlement they must serve any objection and/or notice in writing by January 2, 1998, to Advocacy, Incorporated.

### c. Opinions of Objectors/Intervenors at Settlement Hearing

No objections were received prior to the settlement hearing, and no one in attendance at the settlement hearing voiced any objection to the proposed settlement.

Accordingly, the settlement is hereby APPROVED as fair, adequate, and reasonable.

### C. ATTORNEYS' FEES AND OTHER FEES AND EXPENSES

 The parties submitted to the Court for review their agreement for attorney's fees and training costs. The defendants agree to pay $100,000 as reasonable and customary attorney's fees and expenses, expert consultant fees, and costs of court incurred by class representatives in connection with the filing and prosecution of the litigation as well as for the monitoring of the settlement through dismissal and all further proceedings related to the settlement of the litigation and implementation of the settlement agreement. Defendant VIA also agrees to pay the training costs associated with the training class to be conducted by Mr. James Flemming of JDP and Associates including the airfare for Mr. Flemming and his assistants and two days' reasonable lodging expenses in San

Antonio. Plaintiffs' counsel agrees to pay all other costs associated with the training including meals and professional fees for Mr. Flemming and his assistants. Taking into consideration the amount of time and effort spent by plaintiffs' counsel and the settlement achieved, the Court has found the attorney's fees and costs reasonable and has granted the parties joint motion. *See Order* (docket # 98).

### IV. *CONCLUSION*

Based on the foregoing discussion and the Court's Findings of Fact and Conclusions of Law Regarding Fairness of Class Action Settlement rendered therein,

IT IS HEREBY ORDERED that:

A. The settlement as evidenced by the parties' Settlement Agreement attached as Exhibit 1 to the Joint Motion for Preliminary Approval of the Settlement Agreement (docket # 91) filed on October 3, 1997, is hereby determined to be fair, reasonable and adequate, and the parties are directed to comply with and consummate its terms.

B. Notice of the Proposed Settlement of Class Action given in the form and manner approved in this Court's order filed on October 23, 1997 (docket # 93), is hereby determined to have constituted the most effective and practicable notice under the circumstances of the pendency of the class action, the proposed Settlement, and settlement hearing. This notice fairly and reasonably advised potential class members of their rights under the Settlement and constituted due and sufficient notice for all other purposes to persons entitled to receive notice required by due process and Rule 23 of the Federal Rules of Civil Procedure.

C. The Court has reviewed the Agreement For Attorneys' Fees and Training Costs and by Order dated January 28, 1998, approved the fairness of the attorneys' fees and costs and found those fees and costs to be reasonable.

D. The Settlement Agreement is and shall be binding on all members of the Settlement Class.

E. The lawsuit against defendant VIA shall be dismissed in its entirety when VIA has met all requirements for performance and reporting as set forth in Sections V(A), (B), and VI(A) of the Settlement Agreement or two years following the execution of the Settlement Agreement whichever occurs first.

F. The lawsuit against defendant City of San Antonio shall be dismissed automatically within 30 days of the City's compliance with all reporting obligations set forth in Section VI(B)(1)-(4) of the Settlement Agreement and the underlying responsibilities discussed therein or two years following Court approval of the Settlement Agreement whichever occurs first.

G. If the Settlement provisions are not fulfilled in accordance with the terms of the agreement, then this Order Approving Class Action Settlement shall be rendered null and void and shall be vacated and, in such event, all orders entered in connection therewith shall be vacated and rendered null and void.

G. This Order Approving Class Action Settlement, the Settlement Agreement, and all documents relating thereto, are not, and shall not be construed as, an admission or indication by defendants of the validity of any claims in this action or of any liability or wrongdoing by any of them or of any violation of law; the Order Approving Class Action Settlement and Settlement Agreement and any related documents, are not a concession and shall not in any way be used as an admission or indication with respect to any claim of any wrongdoing, fault, or omission by defendants or any other person in connection with any transaction or occurrence or any statement, release, or written document issued, filed, or made; and this Order Approving Class Action Settlement, the Settlement Agreement and any related document, proceeding, action, or any reports or accounts thereof, shall not be offered or received in evidence in any civil, criminal, or administrative action or proceeding, *except* as expressly set forth in the Settlement Agreement.

K. The Court expressly retains continuing and exclusive jurisdiction over the parties hereto, including all members of the Settlement Class, and over the matters set forth in

the Settlement Agreement, including the administration and enforcement of the Settlement, and any other appropriate or necessary purpose, and the Court reserves the power to protect and effectuate this Order and the Final Judgment to be entered and to enter such orders as may be necessary in aid of its continuing jurisdiction.

L. Because this case may not be formally dismissed until certain provisions of the Settlement Agreement are met and due to the length of time needed to implement the various provisions, IT IS HEREBY ORDERED that this case is administratively CLOSED and shall be removed from this Court's docket for all reporting purposes. Once the conditions have been fulfilled, all claims of Plaintiffs and Settlement Class members in this action will be dismissed on the merits and with prejudice, without costs to any party except as provided in the Settlement Agreement.