# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 16-60550

_____

United States Court of Appeals
Fifth Circuit

**FILED**

July 27, 2017

Lyle W. Cayce
Clerk

THOMAS JONES, on behalf of themselves and others similarly situated; JOSEPH CHARLES LOHFINK, on behalf of themselves and others similarly situated; SUE BEAVERS, on behalf of themselves and others similarly situated; RODOLFOA REL, on behalf of themselves and others similarly situated; HAZEL REED THOMAS, on behalf of themselves and others similarly situated,

Plaintiffs - Appellees

v.

SINGING RIVER HEALTH SERVICES FOUNDATION; SINGING RIVER HEALTH SYSTEM FOUNDATION; SINGING RIVER HOSPITAL SYSTEM FOUNDATION, INCORPORATED; SINGING RIVER HOSPITAL SYSTEM EMPLOYEE BENEFIT FUND, INCORPORATED; SINGING RIVER HOSPITAL SYSTEM; MICHAEL J. HEIDELBERG; MICHAEL D. TOLLESON; TOMMY LEONARD; LAWRENCE H. COSPER; MORRIS G. STRICKLAND; IRA POLK; STEPHEN NUNENMACHER; HUGO QUINTANA; GARY C. ANDERSON; STEPHANIE BARNES TAYLOR; MICHAEL CREWS; SINGING RIVER HEALTH SYSTEM; ALLEN CRONIER; MARTIN BYDALEK; WILLIAM DESCHER; JOSEPH VICE; ERIC WASHINGTON; MARVA FAIRLEY-TANNER; GRAYSON CARTER, JR,

Defendants - Appellees

v.

CYNTHIA N. ALMOND; FRANCISCO C. AGUILAR; KITTY PATRICIA AGUILAR; TANYA R. ARDOIN; RAY J. BARBOUR, ET AL

Appellant

*****************************************************************

REGINA COBB, on behalf of themselves and others similarly situated, ET AL

Plaintiffs

No. 16-60550

v.

SINGING RIVER HEALTH SYSTEM; BOARD OF TRUSTEES FOR THE SINGING RIVER HEALTH SYSTEM; MICHAEL J. HEIDELBERG, in their individual and official capacities; MICHAEL D. TOLLESON, in their individual and official capacities; ALLEN L. CRONIER, in their individual and official capacities; TOMMY L. LEONARD, in their individual and official capacities; LAWRENCE H. COSPER, in their individual and official capacities; MORRIS G. STRICKLAND, in their individual and official capacities; IRA S. POLK, in their individual and official capacities; STEPHEN NUNENMACHER, in their individual and official capacities; HUGO QUINTANA, in their individual and official capacities; MARVA FAIRLEY-TANNER, in their individual and official capacities; WILLIAM C. DESCHER, in their individual and official capacities; JOSEPH P. VICE, in their individual and official capacities; MARTIN D. BYDALEK, in their individual and official capacities; ERIC D. WASHINGTON, in their individual and official capacities; G. CHRIS ANDERSON, in their individual and official capacities; KEVIN HOLLAND, in their individual and official capacities,

Defendants - Appellees

v.

CYNTHIA N. ALMOND; FRANCISCO C. AGUILAR; KITTY PATRICIA AGUILAR; TANYA R. ARDOIN; RAY J. BARBOUR, ET AL

Appellants

_____

Appeal from the United States District Court
for the Southern District of Mississippi

_____

2

No. 16-60550

Before HIGGINBOTHAM, JONES, and HAYNES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The Singing River Health System (SRHS), a community hospital owned by Jackson County, Mississippi, created a defined benefits pension fund into which employees have recently been paying three percent of their paychecks and to which SRHS was obliged to contribute whatever additional amounts were actuarially required to fund the Plan's promised benefits. From 2009-14, however, the hospital fell into serious financial difficulties and made only one plan contribution. The Plan was "frozen" in late November 2014. This appeal considers objections to the settlement of class actions that arose in the wake of the financial crisis. The most troubling issues center on the extraordinarily long-term, unsecured, and unpredictable proposed payout of the settlement amount and the release of the County, a non-party, from liability. We vacate and remand for further consideration of issues concerning the settlement's consequences for Plan beneficiaries.

## BACKGROUND

As described by its CEO, SRHS "is a community-owned not-for-profit health system owned by Jackson County. [Miss. Code Ann. § 41-13-10(c).] It consists of two hospitals . . . [and] five primary care clinics . . . , [and] [i]t employs about 2,400 people." SRHS is the largest employer in Jackson County. County Supervisors appoint seven of the nine members of the SRHS Board; the Chief of Staff and Chief-elect of SRHS occupy the other two seats. *See* Miss. Code. Ann. § 41-13-29. SRHS created the Employees' Retirement Plan and Trust (the "Plan") in 1983 as a successor to the Public Employees' Retirement System of Mississippi.

Since 2008, the most recent version of the Plan has required employees to contribute three percent of their salaries to the Plan. Further, SRHS "shall have the sole responsibility for making the [actuarially determined]

3

contributions necessary to provide benefits under the Plan, as administered by the Board of Trustees of [SRHS]." Finally, although the Plan states that it was established in confidence that it would continue indefinitely, SRHS "reserve[s] the right to terminate the Plan . . . , in whole or in part, at any time."

SRHS's finances became increasingly imperiled during the 2008 recession and with the reduction of federal assistance. Consequently, and without informing the employees, SRHS failed to make all but one of its contributions needed to maintain the Plan's fiscal integrity from 2009 to 2014. In late November 2014, the hospital Board, together with executives and counsel, decided to liquidate the Plan. On December 1, 2014, SRHS announced it was freezing the Plan and, "[i]n the coming months, the Plan will be officially liquidated." At that point, there were over three thousand Plan participants, both current and past employees, of whom approximately 600 were retirees receiving monthly payments.

Counsel for retirees, many of whom have become Objectors to the proposed settlement, immediately sought injunctive relief in the Jackson County Chancery Court, which ordered SRHS not to terminate the Plan. Since that date, however, the Plan has remained "frozen" in that no contributions have been made by employees or SRHS. Plan assets are being steadily depleted, however, because benefit payments to retirees have continued without interruption. In August 2015, the Chancery court held SRHS indebted as a matter of law to the Plan for the missed contributions plus lost earnings, a sum exceeding $55 million.

Numerous lawsuits were soon filed in state and federal court after the announced termination of the Plan. Pertinent here are three Rule 23 class actions commenced and later consolidated in the federal district court, styled

No. 16-60550

as the *Jones*, *Cobb*, and *Lowe* cases.[1] The operative complaint in the lead case, *Jones,* names as defendants the Singing River Health Services Foundation, Singing River Health System Foundation, Singing River Hospital System Foundation, Inc., Singing River Hospital System Employee Benefit Fund, Inc., and Singing River Hospital System (collectively, "SRHS Defendants"), along with various individual SRHS executives and members of SRHS's Board of Trustees. KPMG, LLP, and Transamerica Retirement Solutions Corporation, advisers and administrators of the Plan, also were joined as defendants. *See Jones v. Singing River Health Sys.*, No. 1:14-CV-447, 2016 WL 6106521 (S.D. Miss. June 2, 2016).[2] The *Jones* complaint alleged multiple causes of action for, *inter alia*, state and federal constitutional violations, federal law breaches of ERISA, and state law claims for breach of contract, fraud, and breach of fiduciary duty. *See id.*

Expedited discovery led to the production of "thousands of pages of SRHS financial documents" that enabled the plaintiffs' retained CPA expert to calculate the missed contributions and associated lost Plan earnings. The district court appointed former Chief United States Bankruptcy Judge for the Northern District of Mississippi, David M. Houston, as a mediator, and several mediation sessions, open to various counsel including those of the Objectors, occurred over the next several months.

When the *Jones* Plaintiffs moved for preliminary approval of a settlement, the court granted the motion, conditionally certified the class, and approved procedures for notifying class members, who include all current and

---

[1] A fourth class putative action was stayed pending resolution of this settlement.

[2] Claims against KPMG, LLP and Transamerica Retirement Solutions Corporations remain pending in the district court. The district court did not err in denying KPMG's motion to compel arbitration as to the *Lowe* plaintiffs. *See Jones v. Singing River Health Servs. Found.*, 674 F. App'x 382 (5th Cir. 2017) (affirming the district court judgment).

No. 16-60550

former employee Plan participants, their spouses, alternate payees, death beneficiaries, or "any other person to whom a plan benefit may be owed."

On April 1, 2016, the Plaintiffs moved for approval of the final settlement (the "Settlement Agreement").   The Settlement Agreement contains the following terms specifically touted in the district court opinion:

- SRHS must deposit a total of $149,950,000 into the retirement trust under a thirty-five year schedule.  According to the testimony of the Plaintiff's accountant, the present value of this sum equals the $55 million sum owed by SRHS to the Plan for missed contributions and lost earnings from 2009-14, calculated with a six percent discount rate.

- Jackson County, Mississippi, will pay SRHS $13,600,000 over eight years "[t]o support the indigent care and principally to prevent default on a bond issue by supporting the operations of SRHS."  Jackson County earlier guaranteed the bond issue;

- SRHS will pay attorneys' fees of $6.45 million and expenses up to $125,000 of all Plaintiffs' counsel;

- SRHS will pay incentive awards to the individual class representatives in an amount totaling $12,500;

- The parties will jointly petition the Chancery Court of Jackson County for an order that requires the Plan to be monitored by that court for the duration of the payment schedule;

- SRHS's CFO will give quarterly reports to Stephen Simpson, the Special Fiduciary appointed by the Chancery Court to oversee the Plan;

- Any adjustment to the Plan can only be made with the recommendation of the Special Fiduciary and approval of the Chancery Court after 60 days' notice to Class Members and an opportunity for hearing;

- Plan distributions can only be changed or terminated with the approval of Simpson and the Chancery Court;

6

No. 16-60550

- If SRHS recovers money from other entities or individuals, e.g., KPMG or Transamerica, Simpson can petition the Chancery Court to accelerate SRHS's payments;

- In the event of SRHS's default on its payment obligations, there will be a proceeding in the Chancery Court, and that court can enter judgment on ten days' notice for the unpaid balance.

*See Jones*, 2016 WL 6106521, at *3–5 (district court opinion summarizing the Settlement Agreement). The Settlement Agreement preserves the rights of "all parties," the plaintiffs and SRHS, to pursue claims against corporate entities like KPMG and Transamerica. However, the SRHS entities, all individual defendants associated with those entities, and Jackson County (although not a party to the lawsuits) are released broadly from any possible claims. *Jones*, 2016 WL 6106521, at *5. Further, as a result of the settlement negotiations, a majority of the SRHS Board resigned, and Jackson County retained a turnaround firm to improve SRHS operations and long term financial stability.

Additional important features of the Settlement Agreement not mentioned in the court's opinion are the following:

- There is no collateral or security for the payments owed the Plan by either SRHS or Jackson County; these are wholly unsecured promises to pay.

- The schedule of payments, Ex. A to the settlement agreement, calls for SRHS to make full payout of the Plaintiffs' attorney fees and expenses (over $6.5 million) by the end of September 2018.

- According to the Ex. A payment schedule, SRHS must pay the Plan $6.4 million by September 2017. Then SRHS commits to pay annual amounts totaling $2.4 million for the next two years (through 2019), escalating to $4.2 million from 2020 to 2023. Payments totaling $5.7 million are due in 2024, and annual payments of $4.5 million follow until completion of the payout in 2051. *Id.*

No. 16-60550

- Jackson County owes, under Ex. A, $5.2 million through September 2017, followed by annual payments of $1.2 million through 2024.

- If SRHS obtains payments in litigation against KPMG, Transamerica, or insurers in connection with these matters, Simpson "may petition the Chancery Court to accelerate the payment schedule," and SRHS may oppose that request. Any such recoveries, in other words, do not automatically accrue to the benefit of the Plan, nor will they benefit the Plan in addition to the amounts SRHS must pay.

- Although approval of any changes in distribution, Plan restructuring and/or Plan termination require approval of Simpson and the Chancery Court, that paragraph of the settlement agreement begins by stating: "The payment of the SRHS Consideration may require modification of the Plan to equitably distribute the benefits paid."

Attorneys Earl L. Denham and W. Harvey Barton represent 245 Objectors to the settlement agreement, about 200 of whom are retirees currently receiving benefits under the Plan and, in many cases, substantially depending on those benefits. Their clients comprise about one-third of the Plan's current beneficiaries. The Objectors argued the "settlement is illusory, provides no real protection for class members, and lacks any specificity as to how different class members will be treated should the class be certified and the settlement approved." They also maintained the class did not meet the requirements for certification, and a release of Jackson County was improper. The SRHS Defendants and Plaintiffs supported the Settlement Agreement as the only alternative to lengthy, costly litigation; the only vehicle for obtaining a contribution from Jackson County; and the only feasible way to obtain some reimbursement from the still-financially precarious SRHS.

The district court held a fairness hearing on the Settlement Agreement on May 16–17, 2016 ("Fairness Hearing"), at which thirteen live witnesses testified. Lee Bond, CFO of SRHS, testified about the financial stability of

8

SRHS, the Settlement Agreement, and how the settlement will affect the Singing River hospital system. Wayne Allen Carroll, Jr., an accountant with experience auditing employee benefit plans, testified about how he calculated the value of the missed annual required contributions between 2009 and 2014. Carroll valued the missed contributions at $55,714,784. Because the hospital did not have the present ability to make that payment, the settlement sets forth a payment schedule over a thirty-five year period. Accordingly, the total amount to be paid was adjusted to $149,950,000 to account for the present value of the missed contributions.

Three of the five class representatives, Joseph Lohfink, Hazel Thomas, and Sue Beavers, also testified in support of the settlement at the Fairness Hearing. The Objectors offered testimony of members of their group in opposition. Attorney Stephen Simpson, the Special Fiduciary in the Chancery Court proceeding, was permitted to make a brief statement supporting the Settlement Agreement. In so doing, he noted that he had "requested and reviewed preliminary benefit payout models, based upon certain assumptions, including the consideration proposed in the settlement." The court denied Objectors' request to cross-examine Simpson, and it rejected the request to recall Bond as an adverse witness and to call SRHS Comptroller Craig Summerlin.

On June 2, 2016, the district court entered a memorandum opinion and order granting the motion for final approval of the class action settlement. *See Jones*, 2016 WL 6106521. After carefully considering the issues, the court determined that the settlement "is fair, reasonable and adequate, is ordered finally approved, and shall be consummated in accordance with its terms and provisions." The class was certified pursuant to Fed. Rule Civ. Pro. 23(b)(1)(A), which authorizes non-opt-out class actions where "prosecuting separate actions by or against individual class members would create a risk of . . .

inconsistent or varying adjudications . . . that would establish incompatible standards of conduct for the party opposing the class . . . ."  Determining that there was no just reason for delay, the district court entered partial final judgment under Rule 54(b) as to the claims against the settling defendants. The Objectors timely appealed.[3]

## STANDARD OF REVIEW

"The abuse-of-discretion standard governs this court's review of both the district court's certification of the class and its approval of the settlement under Rule 23." *In re Deepwater Horizon,* 739 F.3d 790, 798 (5th Cir. 2014). *See also Newby v. Enron Corp.*, 394 F.3d 296, 300 (5th Cir. 2004) ("A district court's approval of a class action settlement may be set aside only for abuse of discretion."). "Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." *Allison v. Citgo Petrol. Corp.,* 151 F.3d 402, 408 (5th Cir. 1998).  Whether the district court

---

[3] This court has appellate jurisdiction under 28 U.S.C. § 1291.  The district court properly exercised subject matter jurisdiction over this dispute.  *See* 28 U.S.C. §§ 1331, 1332(d)(2), 1367(a).   The *Jones* complaint alleged federal claims under the United States Constitution, 42 U.S.C. § 1983, and ERISA.  The *Cobb* complaint alleged federal claims under 42 U.S.C. § 1983 and ERISA.  Despite allegations under ERISA, the plan is a governmental plan, and thus is exempt from ERISA.  29 U.S.C. § 1003(b)(1);  The *Lowe* complaint, however, alleged jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d).  The amount in controversy exceeds $5 million, one or more of the Defendants are non-residents of the State of Mississippi, and members of the class are also non-residents of the State or Mississippi. 28 U.S.C. § 1332 (Diversity-CAFA).  *See Frazier v. Pioneer Americas LLC*, 455 F.3d 542, 546–47 (5th Cir. 2006) (holding the state action bar to CAFA jurisdiction applies only where all primary defendants are states, state officials, or other governmental entities against whom the district court may be foreclosed from ordering relief).

applied the correct legal standard in its consideration of the settlement is reviewed de novo. *Deepwater Horizon*, 739 F.3d at 798.

## DISCUSSION

Under Rule 23, a court must hold a hearing to consider whether a proposed class action settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). At the fairness hearing, "[o]bjectors have a right to be heard, but a fairness hearing is not a full trial proceeding." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 641 (5th Cir. 2012). Nevertheless, "district judges must . . . exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions to consider whether the settlement is fair, adequate, and reasonable, and not a product of collusion." *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006) (internal quotation marks omitted). This court has set forth a six-factor test (the "*Reed* Test"), to determine the appropriateness of a proposed settlement:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (citation omitted).

The district court considered each of the elements of class certification as well as the *Reed* factors, all of which, it found, weigh in favor of approving the proposed settlement. The court's treatment of the individual *Reed* factors will be discussed *infra* as pertinent to the issues on appeal.

On appeal, the Objectors challenge the class certification and the court's approval of the settlement. Specifically, they assert that the district court abused its discretion by (1) ignoring evidence of collusion and by failing to order further discovery; (2) finding the Settlement Agreement was fair, reasonable,

and adequate although its future payments to Plan participants are uncertain, SRHS was not required to reimburse contributions owed to the Plan through 2016, and a large number of class members object; (3) overlooking perjury and the alleged destruction of documents; (4) approving the release of Jackson County; (5) approving the settlement where "there is known pending litigation" against Jackson County; and (6) admitting "testimony" of Simpson at the fairness hearing without cross-examination.      Each issue will be discussed in turn.

## I.

The Objectors maintain that the district court improperly certified the class under Rule 23.  Class certification under Rule 23 has four requirements: (1) numerosity;     (2) commonality;     (3) typicality;     and     (4) adequacy     of representation.  Fed. R. Civ. P. 23(a); *see also Ibe v. Jones,* 836 F.3d 516, 528 (5th Cir. 2016).  The burden is on the party seeking certification to satisfy these requirements. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 131 S. Ct. 2548 (2011).

The Objectors challenge only the fourth requirement: the adequacy of both class counsel and class representatives.  The Objectors challenge the zeal and competence of class counsel by questioning many of the decisions made by class counsel, including the fact that counsel did not pursue damages beyond 2014.[4]  The Objectors also argue there was no evidence that class counsel met with class representatives to explain the settlement, no evidence that counsel produced  any  detailed  documentation  that  would  allow  class  members  to

---

[4] Objectors also argue the fact that one of the class representative's names (Rodolfo A. Rel) was misspelled in some of the pleadings shows counsel's inadequacy, but as the district held, "a typographical error is insufficient evidence that the attorney-class representative relationship was lacking."

understand the settlement, and no evidence provided to the district court on how or how much the settlement will pay out to each class member.

The district court explained that the class counsel were experienced in complex litigation and qualified to represent the interests of the proposed class. In regard to the representatives themselves, the district court found that the class representatives have the same interest and desire as the rest of the proposed class to receive retirement benefits as promised by the Plan, and there was no evidence that the class representatives suffer from a conflict of interest. The court concluded the representatives would adequately represent the interests of the class.

Under Rule 23(a)(4), "the representative parties [must] fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). Rule 23(a)(4) involves examination of both the representatives' counsel and the representatives themselves. *See Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982). More specifically, "[t]he adequacy requirement mandates an inquiry into the zeal and competence of the representative's counsel and into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." *Id.* "The adequacy inquiry also 'serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479–80 (5th Cir. 2001) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S. Ct. 2231, 2251 (1997)).

Class counsels' decision not to pursue damages after 2014 was based on the legal uncertainty whether the class could prevail on claims for additional amounts unpaid by SRHS into the Plan, and the greater practical concern whether SRHS could financially make any additional commitment (discussed *infra*) beyond restoring the missed payments from 2009 to 2014. In the face of

this rational calculation, the Objectors are incorrect that limiting the litigation in this way demonstrates class counsel's inadequacy.

The Objectors' contention that there was no evidence that class counsel met with class representatives is refuted by their testimony at the fairness hearing, as is the contention that the representatives did not understand the Settlement Agreement. Objectors' third contention, which concerns the production of documents to the district court, is not relevant to the issue of adequacy of representation. Accordingly, this case is distinguishable from those in which class representatives were inadequate. *See Amchem*, 521 U.S. at 626–28, 117 S. Ct. at 2251 (class members were inadequate where they had diverse, conflicting interests in receiving medical payments). The district court did not abuse its discretion in determining that class representation was adequate for certification.

## II.

Pertinent to the first *Reed* factor concerning the settlement, the Objectors argue that there was evidence of collusion between class counsel and the defendants sufficient to warrant disapproving the Settlement Agreement. Without citing the state court record, the Objectors emphasize numerous curious events in the state court proceedings—*ex parte* meetings, one judge's refusal to recuse, denied discovery requests, alleged improper handling of signed orders, and alleged conflicts. Positing a *quid pro quo* for counsels' less than zealous negotiations, they also question the circumstances that led to a stipulation of class counsel fees within the Settlement Agreement.

The district court found no evidence of collusion or fraud under *Reed.* The time to present evidence regarding collusion would have been at the fairness hearing. *See Reed,* 703 F.2d at 172. Despite the court's admonishing Objectors' counsel to substantiate their allegations with competent evidence at least four times during the fairness hearing, the Objectors presented none.

No. 16-60550

Their request for additional discovery was thus a fishing expedition that the court justifiably preempted.

Moreover, the district court, rightly concerned about the implications of the "clear sailing" fee agreement[5] between class counsel and the SRHS defendants, applied a heightened standard of care in examining the allegations of collusion. *In re Bluetooth Headset Litig.,* 654 F.3d 935, 946 (9th Cir. 2011). After careful review of these contentions, the court found that none of the allegations presented proved collusion. State court discovery decisions, and an allegedly *ex parte* meeting among SRHS counsel, class counsel and the state court that postdated the Settlement Agreement do not raise a fact issue regarding collusion. The court also rejected Objectors' contention that the settlement was collusively produced because an attorney for SRHS represented a former member of the SRHS Board of Trustees during a state court deposition; Objectors failed to show that, even if a conflict of interest existed, the settlement negotiations themselves were unfair or collusive.

To the contrary, the district court relied heavily on the fact that a well-recognized neutral mediator oversaw settlement negotiations of the federal cases to ensure they were conducted at arms' length. That mediator's affidavit affirmed that, "[a]t all times, the participating parties' negotiations were civil, professional, but hard fought. The negotiations were conducted at arm's length without collusion." The involvement of "an experienced and well-known" mediator "is also a strong indicator of procedural fairness." *Morris v. Affinity*

---

[5] The district court cited the following definition of a clear sailing clause: "A compromise in which the defendant agrees not to contest the amount awarded by the court presiding over the settlement as long as the award falls beneath a negotiated ceiling." *William D. Henderson, Clear Sailing Agreements: A Special Form of Collusion in Class Settlements*, 77 Tul. L. Rev. 813, 813 (Mar. 2003). The use of a clear sailing provision is recognized as a red flag regarding arms-length class action settlement negotiations, but it does not automatically justify a finding of collusion. *See, e.g., Gooch v. Life Ins. Co. of Am.,* 672 F.3d 402, 426 (6th Cir. 2012).

No. 16-60550

*Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012*). See also La Fleur v. Med. Mgmt. Int'l, Inc.*, 2014 WL 2967475, at *4 (C.D. Cal. June 25, 2014) ("Settlements reached with the help of a mediator are likely non-collusive").

"Because Appellants have pointed to no record evidence that contradicts this finding . . . [,] we reject their contention that collusion was present in the settlement negotiations." *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004). The district court did not clearly err or abuse its discretion in holding that the proposed settled was not the product of collusion or fraud.[6]

## III.

The Objectors next argue that the Settlement Agreement is not fair, reasonable, or adequate. Their contentions embrace several of the *Reed* factors, including the court's estimate of the complexity and expense of ongoing litigation (factor 2); the probability of plaintiffs' success on the merits (factor 3); and the range of possible recovery (factor 5). Numerous individual points are made, a number of which are articulated for the first time in this court. One of their principal propositions is that the court evaluated only the terms of SRHS's reimbursing the Plan without considering how the settlement would affect individual beneficiaries. A second proposition is that no evidence at the fairness hearing demonstrated how SRHS will comply with its payment obligations in the future or how the Plan's inevitable termination will affect the class members.[7] Objectors also claim that the Settlement Agreement lacks

---

[6] In upholding the district court's ruling on this point, we neither comment on nor affirm the integrity of the state proceedings. Some of the Objectors' allegations about those proceedings are provocative, to be sure, and raise issues that may potentially bear on the status of the Plan and SRHS payments in the future. But any possible state court irregularities did not influence the class action settlement negotiations overseen by the district court and its experienced mediator.

[7] The Objectors also claim that the district court's preliminary certification of the class action as a "limited fund" under Rule 23(b)(1) was in error. Similarly, Objectors argue without citing any authority that the Settlement Agreement is not fair because it did not

adequate safeguards for future declines in the financial health of SRHS. These are serious arguments that go to the heart of the settlement's consequences for the plaintiffs and thus to its fairness and adequacy.

Because the district court's discussion focused too narrowly on SRHS's proffered payments, we will vacate and remand for further elucidation of points relevant to the hospital's ability to sustain the promised settlement payments, how the settlement affects the plaintiffs, and why class counsel should receive their multimillion dollar fees up-front while significant uncertainty surrounds SRHS's future compliance. In this section, we also reject other complaints objectors make against the settlement.

## A.

"The court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants." *In re Katrina Canal Breaches Litig.,* 628 F.3d 185, 195 (5th Cir. 2010). "A district court faced with a proposed settlement must compare its terms with the likely rewards the class would have received following a successful trial of the case." *Reed*, 703 F.2d at 172. This inquiry may also involve whether or not the defendant had the financial means to pay a greater judgment than the settlement agreement. Settlements have been considered fair when "there would be almost insurmountable problems collecting any judgment against the Settling Defendants" due to their "financial insolvency." *Newby*, 394 F.3d at 302. The Objectors take issue with the district court's

---

contain an opt-out provision. However, the District Court ultimately certified this class under, Rule 23(b)(1)(A), as "a mandatory settlement class," Objectors have not briefed the propriety of this legal determination, and it is waived.

No. 16-60550

opening comment at the fairness hearing that, "even bad settlements are better than protracted litigation."

Objectors initially challenge the fairness and adequacy of the Settlement Agreement because the settling parties concededly provided no information regarding the actual payments retirees would receive in the future under the agreement. Appealing on behalf of their clients, many of whom currently rely on the Plan's retirement payments, the Objectors urge that SRHS and the class counsel had a duty to inform the class members transparently about how the settlement would affect their individual financial positions in the future. How much could they expect to receive compared with the implicit promise of lifetime guaranteed payments embodied in the defined benefits Plan? This is a legitimate question, albeit one that is fraught with contingencies and could not readily have been answered for each of over three thousand Plan participants. Instead, the settlement proponents' testimony assured that given SRHS's desperate financial straits, whatever the hospital could promise simply to make up its contribution shortfalls from 2009-14 was all that class members, individually or collectively, could expect. The district court accepted this bit-of-a-loaf-is-better-than-none approach and rejected Objectors' contention that more disclosure was required concerning the Settlement's impact on Plan participants.

In addition, the testimony taken as a whole was remarkably vague about SRHS's future ability to fund its share of payments as well as the results to retirees and other class members if it did not. The court's very brief treatment of these issues in its opinion chose to credit boilerplate summations by the hospitals' CFO Lee Bond that SRHS "should be able" to make its scheduled settlement payments, and "[a]pproval of the settlement would result in an immediate contribution to the Plan and subsequent scheduled contributions that would have the potential to generate earnings for the Plan." *Jones*,

18

2016 WL 6106521 at *15.  The court balanced this "potential" against the ongoing litigation costs for "over 150 lawsuits," the present inability of SRHS to pay its judgment of over $55 million, and the resulting uncertainty of any recovery absent a settlement.  *Id.*  The court concluded that the "proposed settlement recovery . . . replaces one hundred percent of the missed 2009 through 2014 contributions."  *Id.*  The court should have noted, and required the

proponents to address, the significant qualifications to this "one hundred percent" forecast.

According to Bond, SRHS's financial condition, as of the date of the fairness opinion, had moved from unsustainable (losing $39 million annually) in 2014 to a very small positive margin (a few hundred thousand) in mid-2016.  Under Bond's stewardship over two years, SRHS had built up a necessary 65-day cash operating reserve of $51 million, whereas it had less than 30 days cash on hand when he arrived.  In favor of the settlement, SRHS was incurring over a hundred thousand in attorneys' fees every month, and the Plan, as frozen, will run out of money to pay claims in 2024.  Against this improving picture, however, cross-examination elicited that without Jackson County's contribution SRHS "probably [can]not" pay even the $6.5 million class counsel fees as scheduled and approved by the court. As to the settlement, he opined that "those payments or some form of payments can be made" by SRHS to reimburse the Plan.  The hospital had negative equity exceeding $136 million at that time.  Further, the most recent auditor's report for SRHS, covering fiscal year 2015 and introduced for the hearing, showed that the Plan had about $137 million in assets, but approximately $441 million in projected liabilities, and had been paying out over $1 million each month in benefits.

These facts tend to support the necessity of some settlement, but they do not address whether over the extraordinarily lengthy 35-year contemplated

term, SRHS, still in precarious shape, will be able to handle the escalating annual installment payments.[8]    The Settlement Agreement's payment obligations are no more than unsecured contractual obligations of SRHS (and Jackson County); there is no collateral to support them or incentivize payments to the Plan over those to other unsecured creditors.    Multimillion dollar payments for attorneys' fees (over $6.5 million) and installments to the Plan ($6.4 million) are due from SRHS by September 2018, but the system's net operating revenue was recently less than a million dollars.    In 2024, SRHS owes the Plan $5.7 million and thereafter until 2051 $4.5 million annually. Jackson County's initial contribution to the settlement and annual $1.2 million payments raise additional doubts, as these were variously explained to support either indigent care (running at $40 million annually according to Bond) or municipal bond obligations that had been guaranteed by the County.    Either way, this is not much of a "contribution."

Perhaps the most intriguing fact is that class counsel arranged for their agreed, complete payout of fees from SRHS before the end of 2018, and thus alleviated any significant future risk of nonpayment.    Meanwhile, the Plan participants bear considerable risk and, worse, uncertainty.    As the record stands, SRHS's future ability to make escalating annual payments to the Plan over thirty-five years is arguable, and that question compounds with demographic reality as more plaintiffs approach eligibility for retirement benefits.    That counsel assured themselves a multimillion-dollar bird in hand, while leaving the class members two in the bush, is disturbing.    If they were confident about SRHS's ability to comply with the settlement, they could have accepted payments over its prescribed duration.    Doing so would also have

---

[8] The court refused Objectors' request to recall Bond for additional testimony about the Settlement.

freed up more cash for an up-front contribution by SRHS to the Plan and, thus, the class members. This situation is reminiscent of justly derided class action settlements where counsel take home substantial fees while the class members receive worthless coupons. Without more information about the viability and nature of payout prospects for class members under the settlement's terms, class counsel's agreed payout is dubious.

Another factor bearing on the financial fairness of the settlement is that SRHS's recoveries, if any, from SRHS from KPMG and Transamerica are not treated as sums owed directly to the Plan but may be petitioned to be used to reduce SRHS's Plan payments. Also, rather than enable class members to share in any improvement in SRHS's financial fortunes, the Settlement Agreement allows SRHS to reduce its obligated payments ahead of schedule, if it is able, with a very favorable discount rate. In essence, SRHS's accelerated payments would reduce its overall liability and thus the amounts payable to class members as returns on the Plan's assets would accrue at a lower rate. Perhaps these provisions were regarded as safeguards with little potential impact on the settlement, or perhaps they were intended as indirect means of forestalling SRHS's longer-term payment defaults, but they were not explored at the hearing.

The fiscal doubts about payments even in the relatively near term heightened the need for an inquiry into the sufficiency of Plan assets to make promised payments to Plan beneficiaries because they come due over, say, the coming ten to fifteen years. There is no assurance in the record that the Plan will not run out of money to pay the class members' claims well before 2051. The class members, especially current retirees, were owed something more than legal provisions enabling a speedy Chancery Court judgment for failed SRHS Settlement payments and a vague statement that changes in Plan distribution terms would be subject to notice and hearing. Money judgments

are worthless if they cannot be enforced.  Without foreknowledge of the possible timing of payment crises, and the possible results in the event of payment defaults, class members have no way to plan their futures.  Finally, as Objectors point out, the confirmed settlement dispenses with SRHS's significant ongoing litigation costs, but because of the clear possibility that future litigation will occur in the Chancery Court over a missed payment, or changes in distributions, or formal termination and liquidation of the Plan, the class members will continue to need representation.  Even though the Settlement may have been justified as a matter of necessity, the class members were entitled to greater transparency about its weaknesses.

For the foregoing reasons, we vacate and remand for the development of further information in regard to the settlement.

## B.

The Objectors also argue that the Settlement Agreement was unfair and inadequate because it did not include the value of missed contributions in 2015, 2016, and at least to the conclusion of the fairness hearing.  The district court held that the tenuous possibilities that the class would receive, or SRHS would be able to pay, a larger verdict were not sufficient grounds for rejecting the proposed settlement.  By its terms, the Plan could have been terminated in 2014 and might not have been liable at all for subsequent contributions.  On the other hand, a judgment required SRHS to reimburse the Plan for contributions missed from 2009-14.  Although the Plan is not formally terminated, it is not "open" at this time as the Objectors assert; theirs is a litigating position, and a weak one at that.  The court's legitimate doubts that the class could prevail on any post-2014 claim, whether in contract or tort, for missed Plan payments support its conclusion that the settlement was fair and adequate.  *See Ayers*, 358 F.3d at 370–73 (discussing the probability of success on the merits); *Parker v. Anderson*, 667 F.2d 1204, 1209–10 (5th Cir. 1982).

No. 16-60550

The court's skepticism that these additional amounts could hardly be paid anyway is borne out by the record and further justified approval of this aspect of the settlement.

**C.**

The Objectors also contend that the number of Objectors to the settlement warrants its disapproval. "[V]ast class dissatisfaction with the settlement" can require a district court to withhold approval of the agreement. *Reed*, 703 F.2d at 174 (citing *Pettway v. Am. Cast Iron Pipe Co.,* 576 F.2d 1157, 1214–19 (5th Cir. 1978) (disapproving settlement agreement to which 70 percent of class members objected). However, "[a] settlement can be fair notwithstanding a large number of class members who oppose it." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). At the end of the day, it is not the number of Objectors but the quality of their objections that should guide the court's review. "[A] settlement is not fair where all the cash goes to expenses and lawyers, and the [class] members receive only discounts of dubious value." *In re Katrina Canal Breaches Litig.*, 628 F.3d at 195 (citing *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 221 (D. Me. 2003)) (alterations in original).

According to the district court, roughly 205 individuals objected, from among 3,076 class members. The Objectors comprise only 6.66% of the class although they constitute about one-third of the retirees currently receiving Plan payments. Regardless, courts have approved of settlements with much higher percentages of Objectors. *Salinas v. Roadway Express, Inc.,* 802 F.2d 787, 790 (5th Cir. 1986) (34% of known class members objected); *Reed*, 703 F.2d at 174 (number of objections nearly 40%). Therefore, the number of Objectors to the Settlement Agreement does not demonstrate unfairness.

23

No. 16-60550

**IV**.

Contrary to their concerns about SRHS's ability to make future payments, the Objectors complain that the district court refused to invoke stern sanctions, up to and including dismissal of the class actions, because of alleged perjury by Bond about financial documents the Objectors claim were shredded. Such documents, they claim, would have revealed that SRHS is now returned to fiscal solvency and therefore able to bear a verdict for its missed contributions. Yet the district court thwarted their attempt to thoroughly cross-examine Bond about shredding documents, and they were not allowed to offer witness Rachel Thompson, an SRHS employee, who claimed to have witnessed a unique event in which locked boxes of SRHS financial documents were delivered for shredding.

Extensive discovery assures the court the parties have a good understanding of the likely outcomes and their expected value, while reinforcing adversarial bona fides against collusion or conspiracy. This issue pertains to *Reed* factors 1 and 3. *Reed*, 703 F.2d at 172. Thus, "if the record points unmistakably toward the conclusion that the settlement was the product of uneducated guesswork, a court may be acting within its discretion in disapproving the agreement without ever considering whether the agreement's terms are adequate." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981). But the lack of discovery is not necessarily fatal to a settlement agreement, provided the parties demonstrate the case "cannot be characterized as an instance of the unscrupulous leading the blind." *Cotton*, 559 F.2d at 1332. "[T]he trial court is entitled to rely upon the judgment of experienced counsel for the parties." *Id*. at 1330. The quality and experience of the lawyering is thus "something of a proxy for both 'trustworthiness' and 'reasonableness'—that is, if experienced counsel reached this settlement, the court may trust that the terms are reasonable in ways that

24

No. 16-60550

it might not had the settlement been reached by lawyers with less experience in class action litigation." Newberg on Class Actions, § 13:53 (5th ed., updated Dec. 2016).

The Objectors have not made out a case for perjury or discovery violations. The district court asked Bond directly whether he had shredded financial documents, and Bond testified unequivocally that neither he nor anyone under his direction shredded any documents. At the fairness hearing, Carroll, the expert CPA, testified that he had reviewed the financial information of SRHS when assessing the loss to the Plan, up to and including SRHS audited financial statements for the years ending September 30, 2003-2014. Objectors challenge the information he relied on as potentially incomplete, but they do not have any supporting evidence for their suspicion.

"[T]he trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Cotton*, 559 F.2d at 1331. As the settlement proponents note, nearly two hundred thousand pages of financial information were produced during discovery. Without some evidence of such alleged misconduct beyond Thompson's speculation, and some showing of how shredding affected the case, the district court did not abuse its discretion by refusing Thompson's testimony.[9]

---

[9] The Objectors complain that their counsel were not permitted to cross-examine Special Fiduciary Steve Simpson after he read his statement at the fairness hearing. "[N]o court of appeals, to our knowledge, has demanded that district courts invariably conduct a full evidentiary hearing with live testimony and cross-examination before approving a settlement." *Union Asset Mgmt.*, 669 F.3d at 641–42 (5th Cir. 2012) (quoting *Int'l Union v. Gen. Motors Corp.*, 497 F.3d 615, 636 (6th Cir. 2007)). The court's opinion approving the settlement did not cite to or rely on Simpson's statement, which was largely conclusional in any event. Any error was harmless.

25

No. 16-60550

## V.

Throughout their appellate brief, the Objectors contend that the district court erred in approving the settlement because it released Jackson County, Mississippi, a non-party to the class actions, from liability. [10] They argue that Jackson County has a continuing duty to cover any shortfall in the Plan and guarantee payment of the pension to retirees under the Mississippi Code, which states in pertinent part:

> The board of supervisors acting for a county . . . are hereby authorized and empowered to levy ad valorem taxes on all the taxable property of such counties . . . for the purposes of raising funds for the maintenance and operation of hospitals.

Miss. Code Ann. § 41-13-25.   Further, one of the reasons for the Plan's exemption (as the retirement plan of a government entity) from ERISA is that government entities can fulfill their obligations through their taxing power. They also argue that public policy should abjure releasing Jackson County because doing so blesses past official malfeasance and provides a "judicially created blueprint" for other government entities to default on their retiree obligations and escape liability.  Objectors chide the mediator and the court for not looking into Jackson County's ability to pay for SRHS's Plan obligation and, in short, for not forcing the County to assume liability for its wholly-owned

---

[10] Procedurally, they object that while the district court verbally expressed skepticism that a non-party to the case could be released, the court reversed its position when approving the settlement.  A court, however, is entitled to change its mind after deliberating on a legal point.

The Objectors also contend the district court erred in accepting an unsolicited, post-hearing letter from class counsel regarding the release of Jackson County because they had no opportunity to respond.  This argument is without merit.  The release of Jackson County was discussed at length during the fairness hearing, and the very points made by Reeves's letter were addressed when the Objectors raised them.  More importantly, the Objectors did not object to the submission of the letter in the district court and did not seek the opportunity to respond to it at that time.  This argument is therefore waived on appeal.  *See F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994) (arguments not preserved for appeal are waived and cannot be addressed in the first instance by the court of appeals).

No. 16-60550

community hospital system.  *See* Miss. Code. Ann. § 41-13-10(c), (d) (definition of community hospitals).  *See also* § 41-13-15 (county authority to acquire community hospital).

The district court rejected these arguments for good legal reasons.  It held that no statute cited by the Objectors requires the County to levy taxes to fund hospital pensions; § 41-13-25 merely provides that the County is authorized to use revenues for hospital funding, not that it is mandated to do so.  Neither Objectors nor this court has found definitive legal authority holding a Mississippi county responsible for the debts of its "independent" entities.[11]  The district court held that the policy behind granting ERISA exemptions for public entities' plans is an insufficient basis for imposing a legal duty on Jackson County.  The district court noted that the Mississippi Tort Claims Act, Miss. Code Ann. §§ 11-46-1–23, governs any lawsuit against Jackson County, thus limiting any available recovery against the County even if it were not released from liability.[12]

---

[11] The FY 2015 audited financial report for SRHS states:  "While the County may appropriate money from its general fund and levy property taxes to support the operations of the Health System, the Health System has been self-supporting and receives no County appropriations for its operations, nor has it received any such financial support from the County in over twenty-six years."  There is no suggestion from the auditors that the County is a payor of last resort.

[12] The Mississippi Tort Claims Act limits recovery against a political subdivision for tort law to $500,000, providing: "In any claim or suit for damages against a governmental entity or its employee brought under the provisions of this chapter, the liability shall not exceed the following for all claims arising out of a single occurrence for all damages permitted under this chapter: . . . (c) For claims or causes of action arising from acts or omissions occurring on or after July 1, 2001, the sum of Five Hundred Thousand Dollars ($500,000.00)." Miss. Code. Ann. § 11-46-15.  Similarly, political subdivisions are immune from claims arising from breach of an implied contractual term. *City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703, 711 (Miss. 2005) ("Miss.Code Ann. § 11–46–3 grants immunity to the state and its political subdivisions for breach of implied term or condition of any warranty or contract.") (internal quotation omitted).

No. 16-60550

The district court did not abuse its discretion by approving the release of Jackson County. Although it must carefully consider the consequences, a court may approve a class action settlement that releases non-parties if "the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 109 (2d Cir. 2005) (citing *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002)).[13]

Here, Jackson County agreed to make a $13.6 million contribution to SRHS for the stated purpose of assisting with indigent care and to prevent bond default, in exchange for a release of liability for claims that the district court found to have little support or be limited by statute. Whatever liability Jackson County may have had, or however much more it could have contributed to benefit the class than what amounts to approximately 22% of the Plan's liability for missed contributions from 2009-14, the Objectors have not demonstrated that this release renders the Settlement Agreement inadequate.[14]

---

[13] "[T]he rationale behind approving releases of non-parties turns on the courts' interest in the settlement of disputes. A defendant may be unlikely to settle a class action if class members can later pursue unasserted claims, or claims against non-parties, that may have the effect of re-opening the litigation." Newberg on Class Actions § 18:20.

Curiously, Objectors make no argument concerning the court's simultaneous release of individual SRHS defendants from whatever claims may have been asserted based on their ineptitude or malfeasance, and which claims would not necessarily have been "based on the same underlying factual predicate." *See Wal-Mart*, 396 F.3d at 109.

[14] The Objectors argue, in a single paragraph, that the district court erred by approving a settlement when additional lawsuits are pending in state court. In specific, the Objectors appealed the Jackson County Board of Supervisors' decision to contribute to the proposed settlement. The district court considered this argument but held that no authority supports the Objectors' position and that nothing requires the district court to delay approval of the Settlement Agreement until the Objectors' state court appeal has been concluded. The

No. 16-60550

## CONCLUSION

The terms of the Settlement Agreement as they affect Plan participants should have been more thoroughly examined prior to the court's approval. It was improper for the court to limit its consideration to the hospital's ability to pay while ignoring a transparent explanation of the settlement's consequences for the class members. We do not hold that the settlement should not be approved, or cannot be approved as modified, but we Vacate and Remand for further consideration of the following illustrative issues:

1. How, and how much, the future stream of SRHS's payments into the Plan, together with existing Plan assets and prospective earnings, will intersect with future claims of Plan participants, including, but not limited to, what effect the Settlement has on current retirees;

2. What are SRHS's future revenue projections, showing dollar amounts, assumptions and contingencies, from which a reasonable conclusion is drawn that SRHS has the financial ability to complete performance under the settlement;

3. Why any payments from litigation involving KPMG, Transamerica or related entities are permitted to defray SRHS's payment obligation rather than supplement the settlement for the benefit of class members;

4. Why class counsel's fees should not be tailored to align with the uncertainty and risk that class members will bear.

The judgment of the district court is **VACATED** and **REMANDED** with Instructions

---

Objectors have not adequately briefed this argument to show the district court abused its discretion in so holding. *See Mijalis*, 15 F.3d at 1327.